**Scot L. ZIMMERMAN, Plaintiff–Appellant,**

v.

**State of OREGON DEPARTMENT OF JUSTICE, Defendant–Appellee.**

No. 97–36101.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 5, 1998.

Decided March 18, 1999.

---

**7.** We need not decide what impact admitting the confession had on Doe's adjudication as a juve- nile delinquent.

Arlene B. Mayerson, Disability Rights Education & Defense Fund, Inc., Berkeley, California; John L. Schilling, Blake & Schilling, L.L.P., Lake Oswego, Oregon, for the plaintiff-appellant.

Denise G. Fjordbeck, Assistant Attorney General, Oregon Department of Justice, for the defendant-appellee.

Marie K. McElderry, Attorney, United States Department of Justice, Washington, DC, for amicus curiae United States.

Before: KOZINSKI, KLEINFELD, and GRABER, Circuit Judges.

GRABER, Circuit Judge:

Plaintiff brought this action claiming, in part, that defendant's employment practices discriminated against him in violation of Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131, *et seq.* The district court dismissed the action, holding that Title II of the ADA does not apply to employment. Addressing this issue of first impression for the Ninth Circuit, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Because this is an appeal from the dismissal of an action pursuant to Fed.R.Civ.P. 12(b)(6), we accept as true the facts alleged in the complaint. *Associated Gen. Contractors of Am. v. Metropolitan Water Dist.,* 159 F.3d 1178, 1181 (9th Cir.1998).

On January 21, 1995, defendant hired plaintiff on a trial basis as a child support agent. Plaintiff suffers from a disabling eye condition that renders him visually impaired. During his employment, plaintiff asked that defendant reasonably accommodate his disability. Defendant refused and thereafter retaliated against plaintiff. Finally, on December 18, 1995, defendant fired plaintiff.

On June 23, 1997, plaintiff filed this action alleging that defendant had violated Titles I and II of the ADA and a similar state anti-discrimination statute. *Zimmerman v. Oregon Dep't of Justice,* 983 F.Supp. 1327, 1328 (D.Or.1997). Defendant moved to dismiss the action pursuant to Fed.R.Civ.P. 12(b)(6). *Id.*

The district court first dismissed plaintiff's Title I claims, holding that plaintiff had failed to file a timely charge with the Equal Employment Opportunity Commission (EEOC). *Id.* at 1328–29. The court also dismissed plaintiff's state law claim, holding that defendant has Eleventh Amendment immunity. *Id.* at 1330–31. On appeal, plaintiff does not challenge either of those rulings.

Finally, the court dismissed plaintiff's Title II claim, holding that Title II does not apply to employment. *Id.* at 1329–30. The court acknowledged that it is possible to interpret the words of Title II broadly to cover employment. *Id.* at 1330. However, the court relied on contextual clues to reject that interpretation:

I reject plaintiff's interpretation of Title II because it is inconsistent with the structure of the ADA as a whole. In Title I, Congress created a comprehensive statutory scheme prohibiting employment discrimination. In Title II, headed "Public Services," Congress prohibited governments from discriminating against disabled persons in providing services such as

transportation or parks. Allowing employment discrimination claims under Title II would make Title I almost completely redundant as applied to public employees. After establishing a comprehensive statutory scheme in Title I to prohibit discrimination by both public and private employers, why would Congress then create a vague implied remedy for employment discrimination, available only to public employees? Public employees would have no reason to bring discrimination claims under Title I if Title II allowed them to take claims directly to federal court without exhausting administrative remedies.

*Id.* at 1329–30 (footnote and citations omitted). Plaintiff brings this timely appeal to challenge that decision.

## STANDARD OF REVIEW

██ We review *de novo* the district court's dismissal of an action pursuant to Fed. R.Civ.P. 12(b)(6). *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295 (9th Cir.1998).

## DISCUSSION

### A. *Statutory Overview*

The ADA contains five titles: Employment (Title I), Public Services (Title II), Public Accommodations and Services Operated by Private Entities (Title III), Telecommunications (Title IV), and Miscellaneous Provisions (Title V).[1] Americans with Disabilities Act of 1990, Pub.L. No. 101–336, 104 Stat. 327, 327–28 (1990). As those headings suggest, Title I applies specifically to employment:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).

Congress has defined "covered entity" to include state employers such as defendant. The term "covered entity" includes an "employer." 42 U.S.C. § 12111(2). In turn, "employer" includes a "person engaged in an industry affecting commerce who has 15 or more employees." 42 U.S.C. § 12111(5)(A).

Completing the picture of who is covered, the statute defines "person" and "industry affecting commerce" to include a *governmental* "industry, business or activity." *See* 42 U.S.C. § 12111(7) ("The terms 'person' ... and 'industry affecting commerce', shall have the same meaning given such terms in section 2000e of this title."); 42 U.S.C. § 2000e(a) ("The term 'person' includes one or more individuals, governments, governmental agencies, political subdivisions...."); 42 U.S.C. § 2000e(h) ("The term 'industry affecting commerce' means any activity, business, or industry in commerce or in which a labor dispute would hinder or obstruct commerce or the free flow of commerce and includes ... any governmental industry, business, or activity.").

Although Congress generally included governmental employers in Title I, it exempted the *federal* government from that Title. *See* 42 U.S.C. § 12111(5)(B) ("The term 'employer' does not include ... the United States, a corporation wholly owned by the government of the United States, or an Indian tribe...."). That being so, by including governmental employers in Title I, but at the same time excluding federal governmental employers, Congress was referring *only* to state and local governmental employers such as defendant.

Neither party disputes that Title I ordinarily would apply to plaintiff's action. However, Title I requires an employee first to file a charge with the EEOC in a timely manner. *See* 42 U.S.C. § 12117(a) (incorporating the charge requirement from Title VII of the Civil Rights Act of 1964, as amended). Plaintiff failed to satisfy that requirement and, thus, is left to argue that Title II also applies to state employment; Title II does not require him to file a charge with the EEOC.

### B. *Chevron deference*

Title II is the "Public Services" title of the ADA. Congress required the Attorney General to promulgate regulations implementing Title II. *See* 42 U.S.C. § 12134(a). Pursuant to that grant of authority, the Attorney Gen-

---

**1.** As codified, the telecommunications title is not a separate subchapter.

eral has determined that Title II applies to employment:

No qualified individual with a disability shall, on the basis of disability, be subjected to discrimination in employment under any service, program, or activity conducted by a public entity.

28 C.F.R. § 35.140(a) (1998).

Under these circumstances, *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), governs our review of 28 C.F.R. § 35.140(a) and Title II. *See, e.g., Does 1–5 v. Chandler*, 83 F.3d 1150, 1153 (9th Cir.1996) (applying *Chevron* deference to other Title II regulations). Although the parties agree that *Chevron* applies, not surprisingly, they disagree about the outcome of a *Chevron* analysis.

■ In *Chevron*, the Supreme Court devised a two-step process for reviewing an administrative agency's interpretation of a statute that it administers. *See Chevron*, 467 U.S. at 842–44, 104 S.Ct. 2778. *See also Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1452 (9th Cir.1996) ("The Supreme Court has established a two-step process for reviewing an agency's construction of a statute it administers."). Under the first step, we employ our "traditional tools of statutory construction" to determine whether Congress has expressed its intent unambiguously on the question before the court. *Chevron*, 467 U.S. at 843 n. 9, 104 S.Ct. 2778. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. 2778. If, instead, Congress has left a gap for the administrative agency to fill, we proceed to step two. *See id.* at 843, 104 S.Ct. 2778. At step two, we must uphold the administrative regulation unless it is "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844, 104 S.Ct. 2778.

Plaintiff and the Attorney General, as *amicus,* argue that Title II is ambiguous and thus requires us to defer to the Attorney General's regulation. Defendant, to the contrary, argues that Title II expresses Congress' intent unambiguously.

■ We agree with defendant. Congress unambiguously expressed its intent for Title II not to apply to employment. That being so, we end our inquiry at the first step of the *Chevron* analysis and accord the Attorney General's regulation no weight. *See National Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 118 S.Ct. 927, 938–39, 140 L.Ed.2d 1 (1998) ("Because we conclude that Congress has made it clear that the *same* common bond of occupation must unite each member of an occupationally defined federal credit union, we hold that the NCUA's contrary interpretation is impermissible under the first step of *Chevron*") (emphasis in original); *Sierra Club v. United States Envtl. Protection Agency*, 118 F.3d 1324, 1327 (9th Cir.1997) ("Congress has spoken clearly on the subject and the regulation violates the provisions of the statute. Our inquiry ends at the first prong of *Chevron*."). *See also Patterson v. State Dep't of Corrections*, 35 F.Supp.2d 1103, ——, 1999 WL 68373, at *8 (C.D.Ill.1999) (refusing to defer to 28 C.F.R. § 35.140(a), because "Congress clearly intended for employment disputes, whether arising from public or private employment, to be brought only under Title I of the ADA"); *Decker v. University of Houston*, 970 F.Supp. 575, 578 (S.D.Tex.1997) (refusing to defer to 28 C.F.R. § 35.140(a)), *aff'd*, 159 F.3d 1355 (5th Cir.1998) (Table).

## C. *Wording of Title II*

■ Using our "traditional tools of statutory construction," *Chevron*, 467 U.S. at 843 n. 9, 104 S.Ct. 2778, "[w]hen interpreting a statute, [we] look[ ] first to the words that Congress used." *Sanchez v. Pacific Powder Co.*, 147 F.3d 1097, 1099 (9th Cir.1998). "Rather than focusing just on the word or phrase at issue, [we] look[ ] to the entire statute to determine Congressional intent." *Id.*

Title II's operative section provides:

Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be

subjected to discrimination by any such entity.

42 U.S.C. § 12132. The term "public entity" means "any State or local government" or "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(A) & (B).

■ As is evident, that section contains two clauses. First, 42 U.S.C. § 12132 says that

no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity[.]

Congress did not define any of the terms in that clause except "public entity" and "qualified individual with a disability." *See* 42 U.S.C. § 12131 (defining Title II's terms). "When a statute does not define a term, we generally interpret that term by employing the ordinary, contemporary, and common meaning of the words that Congress used." *United States v. Iverson*, 162 F.3d 1015, 1022 (9th Cir.1998).

■ A common understanding of the first clause shows that it applies only to the "outputs" of a public agency, not to "inputs" such as employment. *See Decker*, 970 F.Supp. at 578 ("The phrase 'services, programs, and activities,' ... understood as a whole, focuses on a public entity's outputs rather than inputs.") (citation and internal quotation marks omitted). First, employment by a public entity is not commonly thought of as a "service, program, or activity of a public entity." Second, the "action" words in the sentence presuppose that the public entity provides an output that is generally available, and that an individual seeks to participate in or receive the benefit of such an output.

Consider, for example, how a Parks Department would answer the question, "What are the services, programs, and activities of the Parks Department?" It might answer, "We operate a swimming pool; we lead nature walks; we maintain playgrounds." It

would not answer, "We buy lawnmowers and hire people to operate them." The latter is a means to deliver the services, programs, and activities of the hypothetical Parks Department, but it is not itself a service, program, or activity of the Parks Department.

Similarly, consider how a member of the public would answer the question, "What are the services, programs, and activities of the Parks Department in which you want to participate, or whose benefits you seek to receive?" The individual might answer, "I want to participate in the Wednesday night basketball league, or find out about the free children's programs for the summer months." The individual would not logically answer, "I want to go to work for the Parks Department."

We conclude, then, that the wording of the first clause does not suggest that Congress intended for Title II to apply to employment.[2] Almost all other courts have, at least implicitly, adopted the foregoing interpretation.[3] In particular, although they have held that Title II applies to employment, they have not done so because of the wording of the first clause. Instead, the courts that have considered that wording have held that it does not apply to employment. *See, e.g., Decker*, 970 F.Supp. at 578 (so holding). *See also Larramendy v. San Mateo County Transit Dist.*, No. 97–3436, 1998 WL 456283, at *3 n. 1 (N.D.Cal. July 30, 1998) (holding that Title II does not apply to the plaintiff's employment action, because the "plaintiff is not claiming that he was trying to avail himself of a public service, such as use of a public bus, administered by the District; instead, he is claiming that the District, as employer, violated his rights as an employee"); *Iskander v. Rodeo Sanitary Dist.*, No. C–94 0479–SC, 1995 WL 56578, at *9 (N.D.Cal. Feb.7, 1995) ("This section concerns the rendering of services to the public by public entities, *i.e.*, public transportation. Title II is inapplicable to the District's composition of employees.") (citation and footnote

---

**2.** If there were any doubt about the meaning of the first clause, it would be resolved by resort to the statutorily defined term, "qualified individual with a disability," which we discuss in the text below.

**3.** The only exception appears to be *Dominguez v. City of Council Bluffs, Iowa*, 974 F.Supp. 732, 736–37 (S.D.Iowa 1997).

omitted), *aff'd on other grounds,* 121 F.3d 715 (9th Cir.1997) (Table).

The second clause of 42 U.S.C. § 12132 states that

> no qualified individual with a disability shall, by reason of such disability, ... be subjected to discrimination by any such entity.

Some courts have held that the second clause is entirely independent from the first and that it prohibits any form of discrimination by a public entity. *See Bledsoe v. Palm Beach County Soil & Water Conservation Dist.,* 133 F.3d 816, 822 (11th Cir.) ("[T]he language of Title II's antidiscrimination provision does not limit the ADA's coverage to conduct that occurs in the 'programs, services, or activities,' of [a public entity]. Rather, it is a catch-all phrase that prohibits all discrimination by a public entity, regardless of the context.") (citation and internal quotation marks omitted), *cert. denied,* — U.S. —, 119 S.Ct. 72, 142 L.Ed.2d 57 (1998); *Innovative Health Sys., Inc. v. City of White Plains,* 117 F.3d 37, 44–45 (2d Cir.1997) (same) (not an employment action). *See also Alberti v. City & County of San Francisco Sheriff's Dep't,* 32 F.Supp.2d 1164, 1169 (N.D.Cal.1998) ("The statute's construction evinces congressional intent to keep the term 'or be subject to such discrimination' broad. Although Congress did not insert the word 'employment' it could be read to include all forms of discrimination. . . ."); *Downs v. Massachusetts Bay Transp. Auth.,* 13 F.Supp.2d 130, 135 (D.Mass.1998) ("The [defendant] focuses exclusively on the access to the 'services, programs, or activities' of public entities guaranteed by the first prong of this section, and disregards the general prohibition on discrimination provided by the second prong.").

Under that interpretation, Title II would be broad enough to include employment discrimination by a public entity. We do not, however, agree with that interpretation for two reasons: (1) it takes the key phrase out of context, and (2) it conflicts with Ninth Circuit precedent.

■ Initially, the placement of the second clause in the single sentence that forms 42 U.S.C. § 12132 suggests that the second clause relates back to the same "services, programs, or activities" of a public entity that the first clause covers. Moreover, of course, Title II pertains to "Public Services." *See Almendarez–Torres v. United States,* 523 U.S. 224, 118 S.Ct. 1219, 1226, 140 L.Ed.2d 350 (1998) ("[T]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute.") (citation and internal quotation marks omitted). Although placement of the second clause and the heading of the section do not, by themselves, unambiguously indicate Congress' intent, the remainder of Title II does.

■ To prevail on a Title II claim, including a claim under the second clause, a plaintiff must prove that he or she is a "qualified individual with a disability." *See* 42 U.S.C. § 12132 (so providing); *Weinreich v. Los Angeles County Metro. Transp. Auth.,* 114 F.3d 976, 978 (9th Cir.1997) ("To prove a public program or service violates Title II of the ADA, a plaintiff must show ... [that] he is a 'qualified individual with a disability.' "), *cert. denied,* — U.S. —, 118 S.Ct. 423, 139 L.Ed.2d 324 (1997). Title II defines that requirement:

> As used in this subchapter:
>
> . . . . .
>
> The term "qualified individual with a disability" means *an individual with a disability who,* with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, *meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.*

42 U.S.C. § 12131(2) (emphasis added). A plaintiff is not "qualified" to bring any Title II claim unless he or she "meets the essential eligibility requirements" of a government service, program, or activity provided by a public entity. The second clause of § 12132 therefore must relate to a government service, program, or activity; otherwise a plaintiff is not "qualified" to bring a claim under that clause. Using the ordinary meaning of

the phrase emphasized above, we return to what we said about the first clause of § 12132. Obtaining or retaining a job is not "the receipt of services," nor is employment a "program[ ] or activit[y] provided by a public entity." Again, the "action" words in the statute assume a relationship between a public entity, on the one hand, and a member of the public, on the other. The former *provides* an output that the latter *participates in or receives.*

 This court already has hinted at the foregoing interpretation of the second clause. In *Crowder v. Kitagawa,* 81 F.3d 1480 (9th Cir.1996), this court held that Congress' placement of the word "or" between the two clauses in 42 U.S.C. § 12132 indicates its intent to prohibit two things: "Due to the insertion of 'or' between exclusion from/denial of benefits on the one hand and discrimination by a public entity on the other, we conclude Congress intended to prohibit two different phenomena." *Id.* at 1483. In particular, Congress intended for the second clause to prohibit *intentional* discrimination, whereas it intended for the first clause to prohibit *disparate treatment* of the disabled. *See id.* ("Congress intended to prohibit outright discrimination, as well as those forms of discrimination which deny disabled persons public services disproportionately due to their disability.").

*Crowder,* thus, suggests that both clauses prohibit discrimination by a public entity in providing its services, programs and activities. The clauses differ only in their method of prohibiting discrimination. *See, e.g., id.* at 1483–84 ("Few would argue that architectural barriers to disabled persons such as stairs, or communication barriers such as the preference for the spoken word, are intentionally discriminatory. Yet, stairs can deny the wheelchair-bound access to services provided on the second floor of a government building; and communicating only by the spoken word can deny deaf persons the ability to find out that it is the second floor where they must go to obtain the services they seek.").

In summary, the second clause of 42 U.S.C. § 12132, like the first, prohibits discrimination only in a public entity's "outputs." Thus, the wording of 42 U.S.C. § 12132 does not permit an inference that

Congress intended for Title II to apply to employment.

### D. *Structure of the ADA*

 Even were the wording of Title II ambiguous, by itself, the structure of the ADA as a whole unambiguously demonstrates that Congress did not intend for Title II to apply to employment. *See National R.R. Passenger Corp. v. Boston & Maine Corp.,* 503 U.S. 407, 417, 112 S.Ct. 1394, 118 L.Ed.2d 52 (1992) ("In ascertaining whether the agency's interpretation is a permissible construction of the language, a court must look to the structure and language of the statute as a whole.").

The structure of the ADA demonstrates congressional intent in five main ways: (1) Congress placed employment-specific provisions in Title I, which it labeled "Employment," whereas Congress placed no employment-related provisions in Title II, which it labeled "Public Services." (2) Congress defined "qualified individual with a disability" differently in Title I than in Title II. In Title I, a person is "qualified" if the person can work, whereas in Title II a person is "qualified" if the person is eligible to receive services or participate in a publicly provided program. (3) Allowing employment discrimination claims under Title II would make Title I redundant as applied to public employees and would eviscerate the procedural requirements of Title I for those employees. (4) Congress gave regulatory authority to different agencies for Title I and Title II. Congress gave authority over Title I to the EEOC, the agency that administers most federal employment-related statutes. (5) Congress expressly linked the employment-related provisions of the Rehabilitation Act to Title I of the ADA, not to Title II. We discuss each of those aspects of the ADA's structure in turn.

First, Title I contains detailed and comprehensive employment provisions. Title II, on the other hand, is completely devoid of any employment provisions. For example, in Title I ("Employment"), the term "qualified individual with a disability" speaks to a person's qualifications *to work.* By contrast, as discussed above, in Title II ("Public Services") a "qualified individual with a disabili-

ty" means a person who is eligible *to receive services* or *to participate in a publicly provided program or activity.* *Compare* 42 U.S.C. § 12111(8) (Title I):

As used in this subchapter:

. . . . .

The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

*with* 42 U.S.C. § 12131(2) (Title II):

As used in this subchapter:

. . . . .

The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

Likewise, in Title I, "reasonable accommodation" addresses specifically the needs of the disabled *in the workplace.* Title II does not contain a similar definition. *Compare* 42 U.S.C. § 12111(9) (Title I):

As used in this subchapter:

. . . . .

The term "reasonable accommodation" may include-

(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjust-

ment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

*with* 42 U.S.C. § 12131 (Title II) (using the undefined term "reasonable modification").

Congress thus crafted extensive employment-specific provisions in Title I. It omitted any mention of employment in Title II. In that circumstance, we must give effect to the different wording and different focus of the two provisions. *See Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (citation and internal quotation marks omitted). *See also Patterson,* 35 F.Supp.2d 1103, at 1109 (relying, in part, on the different definitions of "qualified individual with a disability" to hold that "Congress never intended for Title II to cover employment disputes").

We turn next to the principle of giving full effect to each provision of a statute. Congress consciously and expressly chose to include the employment practices of state and local governments in Title I. To hold that Title II also governs their employment practices would render Congress' special effort to ensure their inclusion in Title I superfluous. Public employees could avoid the procedural requirements of Title I by pursuing all their claims under Title II. This court generally refuses to interpret a statute in such a manner. *See Northwest Forest Resource Council v. Glickman,* 82 F.3d 825, 834 (9th Cir.1996) ("We have long followed the principle that [s]tatutes should not be construed to make surplusage of any provision.") (citation and internal quotation marks omitted).

Titles I and II of the ADA incorporate their remedies and procedures from different acts: Title I incorporates provisions of Title VII of the Civil Rights Act of 1964, as amended,[4] while Title II incorporates provi-

4. *See* 42 U.S.C. § 12117(a) (Title I) ("The powers, remedies, and procedures set forth in sec-

tions 2000e-4, 2000e-5 [charge requirement], 2000e-6, 2000e-8 and 2000e-9 of this title [Title

sions of the Rehabilitation Act.[5] Title I thereby incorporates Title VII's charge requirement, whereas Title II incorporates the Rehabilitation Act's provisions, which do not require an employee to pursue any administrative relief. *See Smith v. Barton*, 914 F.2d 1330, 1338 (9th Cir.1990) ("[P]rivate plaintiffs suing under section 504 [of the Rehabilitation Act] need not first exhaust administrative remedies."). Allowing employment claims under Title II would render the charge requirement completely superfluous for public employees.

Next, we consider Congress' choices respecting delegation of authority to the Executive Branch. Titles I and II delegate the responsibility to promulgate regulations to different agencies. Title I requires the EEOC to issue regulations interpreting that title. 42 U.S.C. § 12116. Title II, on the other hand, gives that power to the Attorney General. 42 U.S.C. § 12134(a). If both Title I and II apply to disability discrimination in employment, then it is possible for state and local governments to be subjected to conflicting regulations.

Congress was aware of the problem that conflicting regulations could create. In response to that potential problem, Congress ordered the agencies charged with enforcing Title I (the EEOC) and the Rehabilitation Act of 1973 (the Attorney General) to "develop procedures to ensure that administrative complaints filed under this subchapter and under the Rehabilitation Act of 1973 are dealt with in a manner that avoids duplication of effort and prevents imposition of inconsistent or conflicting standards for the same requirements under this subchapter and the Rehabilitation Act of 1973." 42 U.S.C. § 12117(b). Congress' failure to include a similar provision for coordination be-

tween Titles I and II is evidence that it did not intend for the Attorney General to have any power over employment under Title II; it never envisioned that there could be a conflict.

Finally, the ADA's linkage of Title I and the Rehabilitation Act establishes that Congress thought that the ADA's employment-related provisions were embodied in Title I, not Title II. Congress made this linkage even stronger in 1992 when it amended the Rehabilitation Act to incorporate employment-related standards from Title I, not Title II:

> The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied *under title I of the Americans with Disabilities Act of 1990* (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201–12204 and 12210), as such sections relate to employment.[6]

29 U.S.C. § 794(d) (emphasis added).[7]

In conclusion, when viewed as a whole, the text, context and structure of the ADA show unambiguously that Congress did not intend for Title II to apply to employment. Under these circumstances, we do not resort to legislative history, and we do not defer to the Attorney General's regulation. *See, e.g., Sloan v. West*, 140 F.3d 1255, 1261 (9th Cir.1998) ("If the intent of Congress is clear from the face of the statutory language, we must give effect to the unambiguously expressed Congressional intent."); *Moyle v. Director, Office of Workers' Comp. Programs*, 147 F.3d 1116, 1120 (9th Cir.1998) ("When interpreting a statute, we ordinarily first look to the plain meaning of the lan-

VII] shall be the powers, remedies, and procedures this subchapter provides to the Commission, to the Attorney General, or to any person alleging discrimination on the basis of disability in violation of any provision of this chapter, or regulations promulgated under section 12116 of this title, concerning employment.").

**5.** *See* 42 U.S.C. § 12133 (Title II) ("The remedies, procedures, and rights set forth in section 794a of Title 29 [the Rehabilitation Act] shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimi-

nation on the basis of disability in violation of section 12132 of this title.").

**6.** The other cited sections of the ADA are among the "Miscellaneous Provisions."

**7.** Ordinarily, the 1992 Congress' interpretation of a 1990 statute would provide no guidance. However, 1992 was the first year in which the ADA took effect, so the 1992 Congress was the first Congress that had to address the interrelationship between the ADA and the Rehabilitation Act.

guage used by Congress. But if the statute is ambiguous, we consult the legislative history, to the extent that it is of value, to aid in our interpretation.") (citation and internal quotation marks omitted), *petition for cert. filed,* 67 U.S.L.W. 3394 (U.S. Dec. 3, 1998) (No. 98–927).[8]

E. *Rehabilitation Act*

1. *Express incorporation*

 Plaintiff and *amicus* argue that Title II expressly incorporates the Rehabilitation Act's prohibition on employment discrimination. We disagree.

Plaintiff and *amicus* rely, first, on 42 U.S.C. § 12133, which provides:

> The remedies, procedures, and *rights set forth in section 794a* of Title 29 [the Rehabilitation Act] shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title.

(Emphasis added.) Because one of the "rights" in the Rehabilitation Act is the right to be free from employment discrimination, plaintiff and *amicus* argue, 42 U.S.C. § 12133 incorporates that "right" into Title II.

However, 42 U.S.C. § 12133 incorporates only one section of the Rehabilitation Act: 29 U.S.C. § 794a. That section includes the Rehabilitation Act's *procedural* rights, not its *substantive* rights. Congress' choice to incorporate one section of the Rehabilitation Act, which provides certain procedures, does not demonstrate that Congress also intended to incorporate the rest of the Rehabilitation Act's substance. Indeed, it demonstrates precisely the opposite. *See, e.g., Longview Fibre Co. v. Rasmussen,* 980 F.2d 1307, 1313 (9th Cir.1992) ("No sensible person accustomed to the use of words in laws would speak so narrowly and precisely of particular statutory provisions, while meaning to imply a more general and broad coverage than the

statutes designated. In this case, expressio unius est exclusio alterius.").

Second, plaintiff and *amicus* rely on 42 U.S.C. § 12134(b), which provides in part:

> [R]egulations under subsection (a) of this section shall be consistent with this chapter and with the coordination regulations under part 41 of title 28, Code of Federal Regulations (as promulgated by the Department of Health, Education, and Welfare on January 13, 1978), applicable to recipients of Federal financial assistance under section 794 of Title 29.

They argue that, because 28 C.F.R. § 41.1 *et seq.* (1989) prohibited employment discrimination, the foregoing provision demonstrates Congress' intent to incorporate that prohibition into Title II. *See* 28 C.F.R. §§ 41.52–41.55 (so prohibiting). *See also* 28 C.F.R. § 35.140 App. A ("The statutory language of section [12134] of the ADA requires the Department to issue a regulation that is consistent with the ADA and the Department's coordination regulation under section 504, 28 C.F.R. part 41. The coordination regulation specifically requires nondiscrimination in employment."). We again disagree.

Unlike 42 U.S.C. § 12133, 42 U.S.C. § 12134(b) does not suggest that Congress intended to incorporate *any* provisions from the Rehabilitation Act into Title II. Instead, 42 U.S.C. § 12134(b) merely requires the Attorney General to ensure that the regulations are "compatible" to the extent that they overlap. *See, e.g., Webster's Third New Int'l Dictionary* 484 (unabridged ed. 1993) ("Consistently [means] ... compatibly ... congruously ... [or] in harmony with."). The regulations in question embrace four main topics: They define terms such as "handicap" or "disability"; list types of prohibited discrimination in programs, activities, and services; list types of prohibited discrimination in employment; and set accessibility standards. Because of the several topics, of which employment is but one, we cannot

We again part ways with the Eleventh Circuit. We have reviewed the legislative history thoroughly and find it ambiguous at best. More importantly, we are bound by what Congress actually enacted.

infer that Congress intended employment to be an area of regulatory overlap.

We conclude that Congress did not expressly incorporate the substantive employment provisions of the Rehabilitation Act into Title II.

### 2. *Implied incorporation*

Even if Title II of the ADA does not expressly incorporate the Rehabilitation Act's substantive employment rights, plaintiff and *amicus* argue, it impliedly incorporates those rights. We are not persuaded.

Congress did model Title II on the Rehabilitation Act. *See Weinreich,* 114 F.3d at 978 ("Title II of the ADA was expressly modeled after Section 504 of the Rehabilitation Act...."). Plaintiff and *amicus* argue that, because Title II merely expands the reach of the Rehabilitation Act, Title II *must* also apply to employment.

Unlike the Rehabilitation Act, Title II applies to all public entities, whether or not they receive federal financial assistance. Thus, in some respects, it is true that Congress *broadened* the provisions of the Rehabilitation Act in Title II.

▉ On the other hand, the Rehabilitation Act also applied (and still does apply) to private entities that receive federal financial assistance. *See* 29 U.S.C. § 794(b) ("[T]he term 'program or activity' means all operations of ... an entire corporation, partnership, or other *private* organization ....") (emphasis added). *See also Jacobson v. Delta Airlines, Inc.,* 742 F.2d 1202, 1209 (9th Cir.1984) (holding that private airlines are subject to the Rehabilitation Act if they receive federal subsidies). Congress did not make private entities subject to Title II; instead, they are subject only to Titles I, III, and V. In other words, Congress also *limited* the reach of the Rehabilitation Act in Title II.

In the circumstances, Congress' use of the Rehabilitation Act as a model for Title II does not, standing alone, evidence Congress' intent to incorporate the employment provisions from that Act into Title II, as distinct from Title I. Rather, we must examine carefully the similarities and differences between the two statutes to determine whether Congress had such an intent.

Plaintiff and *amicus* note that Title II contains wording that is similar to the wording found in § 504 of the Rehabilitation Act. Before the enactment of the ADA, the Supreme Court had held that § 504 applies to employment. *Consolidated Rail Corp. v. Darrone,* 465 U.S. 624, 631–34, 104 S.Ct. 1248, 79 L.Ed.2d 568 (1984). Plaintiff and *amicus* argue that we must interpret Title II, likewise, to apply to employment. *See, e.g., Bledsoe,* 133 F.3d at 821 ("It is significant that Congress intended Title II to work in the same manner as Section 504 of the Rehabilitation Act, because Section 504 was so focused on employment discrimination that Congress enacted subsequent legislation to clarify that Section 504 applied to other forms of discrimination in addition to employment discrimination.") (citing *Consolidated Rail,* 465 U.S. at 626–32, 104 S.Ct. 1248); *Alberti,* 32 F.Supp.2d 1164, ——, 1998 WL 954876, at *5 ("Congress modeled Title II of the ADA after the Rehabilitation Act.... [W]hen Congress passed the ADA in 1990, it was clearly established that the Rehabilitation Act covers employment discrimination.") (citing *Consolidated Rail,* 465 U.S. at 624, 104 S.Ct. 1248); *Downs,* 13 F.Supp.2d at 135 ("[L]anguage in § 504 very similar to that of 42 U.S.C. § 12132 (and similarly devoid of express reference to employment) had long been understood to prohibit employment discrimination.") (citing *Consolidated Rail,* 465 U.S. at 632, 104 S.Ct. 1248); *Ethridge v. Alabama,* 847 F.Supp. 903, 906 (M.D.Ala. 1993) ("A primary purpose of § 12131 was to extend the reach of § 504 of the Rehabilitation Act of 1973 ... Section 504, including its amendments and regulations, clearly applies to employment discrimination.") (citing *Consolidated Rail,* 465 U.S. at 626, 104 S.Ct. 1248).

The answer is not so simple, for four reasons. (1) Textually, Congress did not borrow the wording of § 504 verbatim when it drafted Title II, although the phrasing of the two statutes is similar. (2) Contextually, surrounding sections of the Rehabilitation Act relate explicitly to employment, whereas no section of Title II relates to employment. (3) The Congressional purpose to cover employment could not be carried out under the Rehabilitation Act except by construing its

sole operative provision, § 504, to encompass employment, whereas the Congressional purpose to cover employment is carried out in a separate operative provision of the ADA (Title I).(4) Congress has linked the Rehabilitation Act to Title I, but not Title II, of the ADA.

 We turn first to the statutory text. "[W]hen a legislature borrows an already judicially interpreted phrase from an old statute to use it in a new statute, it is presumed that the legislature intends to adopt not merely the old phrase but the judicial construction of that phrase." *Long v. Director, Office of Workers' Comp. Programs,* 767 F.2d 1578, 1581 (9th Cir.1985) (citation and internal quotation marks omitted). *See also Collings v. Longview Fibre Co.,* 63 F.3d 828, 832 n. 3 (9th Cir.1995) ("The legislative history of the ADA indicates that Congress intended judicial interpretation of the Rehabilitation Act be incorporated by reference when interpreting the ADA."). That rule of interpretation makes sense, however, only when the new statute contains materially the same phrase as is found in the old statute. Here, Congress chose not to adopt the broad wording of the Rehabilitation Act.

When the Supreme Court interpreted § 504 of the Rehabilitation Act, that section provided in part

No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subject to discrimination *under any program or activity receiving Federal financial assistance* or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794 (1984) (emphasis added); *Consolidated Rail,* 465 U.S. at 632, 104 S.Ct. 1248. The Rehabilitation Act's phrase "under any program or activity receiving Federal financial assistance" is broader than Title II's phrase, "in ... the services, programs, or activities of a public entity."

The focus of the emphasized phrase in § 504 of the Rehabilitation Act is the receipt of Federal financial assistance. *See Consolidated Rail,* 465 U.S. at 631–36, 104 S.Ct. 1248 (discussing the meaning of the requirement that a program receive Federal financial assistance). Discrimination is prohibited under any program or activity that receives such assistance. This focus naturally encompasses the entire operation of the program or activity, for its federal funding may well flow into compensation for employees.

To the extent that there was any ambiguity about the breadth of that wording when the Supreme Court decided *Consolidated Rail,* Congress amended § 504 in 1988 to make its breadth clear. That amendment defined the term "program or activity" to include "all of the operations" of the entity.[9]

By contrast, the focus of Title II of the ADA is on the services, programs, or activities that a public entity provides. That is an outward-looking focus.

In summary, when Congress enacted the ADA, § 504's "under any program or activity" wording was very broad. Congress' decision to use a narrower phrase in Title II indicates its intent for Title II not to be coextensive with the Rehabilitation Act.

Moreover, unlike Title II of the ADA, the Rehabilitation Act contained several employment-related provisions. For example, Congress limited the application of § 504 to an "otherwise qualified handicapped individual in the United States, as defined in section 706(7)." 29 U.S.C. § 794 (1984). In turn, 29 U.S.C. § 706(7) defines that term *solely in relation to employment. See* 29 U.S.C. § 706(7)(A) (1984) ("[T]he term 'handicapped individual' means any individual who (i) has a physical or mental disability which for such individual constitutes or results in a substantial handicap to *employment;* and (ii) can reasonably be expected to benefit in terms of *employability.*") (emphasis added). *See also*

---

**9.** Title 29 U.S.C. § 794(b) provides in part:

For the purposes of this section, the term "program or activity" means all of the operations of—

(1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or

(B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government[.]

29 U.S.C. § 706(7)(B) (1984) ("For purposes of *sections 793 and 794 of this title as such sections relate to employment,* such term does not include any individual who is an alcoholic or drug abuser whose current use of alcohol or drugs prevents such individual from performing the duties of the job in question or whose employment, by reason of such current alcohol or drug abuse, would constitute a direct threat to property or the safety of others.") (emphasis added).

In fact, one of Congress' express purposes in enacting the Rehabilitation Act was to "promote and expand employment opportunities in the public and private sectors for handicapped individuals." *See Consolidated Rail,* 465 U.S. at 626, 104 S.Ct. 1248 (quoting 29 U.S.C. § 701(8) (1973)). These textual and contextual clues demonstrated that Congress intended for the Rehabilitation Act to apply to employment despite the absence of an express mention of employment in § 504 itself.

By contrast, Title II contains no employment-specific provisions. Congress placed all of those provisions in Title I. Unlike the ADA, the Rehabilitation Act has no separate title specifically governing employment. *See, e.g., Consolidated Rail,* 465 U.S. at 632 n. 13, 104 S.Ct. 1248 (contrasting the Civil Rights Act of 1964 because, "[a]s the Court of Appeals observed, it was unnecessary to extend Title VI more generally to ban employment discrimination, as Title VII comprehensively regulates such discrimination").

The Supreme Court's interpretation of Title IX of the Education Amendments of 1972 (which the Supreme Court also has held applies to employment) highlights the effect of that difference in statutory structure. *See North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982) (construing Title IX). Title IX provides in part:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination *under any education program or activity receiving Federal financial assistance* ....

20 U.S.C. § 1681(a) (emphasis added). As does the Rehabilitation Act, Title IX contains the phrase "under any ... program or activity receiving Federal financial assistance," which is broader than the corresponding phrase in Title II of the ADA. The Supreme Court noted that the wording of Title IX was "broad" and that it "favor[ed]" inclusion of employees. *North Haven,* 456 U.S. at 520, 522, 102 S.Ct. 1912. Even so, before concluding that Title IX covered employment, the Court reasoned:

> [I]f we are to give [Title IX] the scope that its origins dictate, we must accord it a sweep as broad as its language. Because [Title IX] neither expressly *nor impliedly* excludes employees from its reach, we should interpret the provision as covering and protecting these "persons" *unless other considerations counsel to the contrary.*

*Id.* at 521 (emphasis added) (citations and internal quotation marks omitted).

There is no need under the ADA to interpret Title II broadly "to give [the ADA] the scope that its origins dictate." Unlike both Title IX and the Rehabilitation Act, the ADA contains a detailed, separate employment discrimination title. Title I protects nearly all state and local government employees even if Title II does not apply to employment. *See Bledsoe v. Palm Beach Soil & Water Conservation Dist.,* 942 F.Supp. 1439, 1444 n. 4 (S.D.Fla.1996) ("The Court recognizes that the Supreme Court has construed similar language in the Rehabilitation Act to include employment. However, the Rehabilitation Act only applied to any 'program or activity,' and added that these were to be construed to include 'all operations' of the covered entities. The Court believes that by ... creating an entire new section devoted to employment, Congress meant to bifurcate the ADA into one section dealing with public and private employment relationships, and one section dealing with government services.") (citation omitted), *rev'd,* 133 F.3d 816 (11th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 72, 142 L.Ed.2d 57 (1998).[10]

Finally, as noted above, Congress amended the Rehabilitation Act to incorporate the employment provisions from Title I of the ADA.

---

**10.** As the citation shows, the Eleventh Circuit has reversed the district court's decision in *Bledsoe.* We cite the district court's decision for the strength of its reasoning and not the force of its authority.

*See* 29 U.S.C. § 794(d) (quoted at p. 2345 above). Because Congress expressly linked the Rehabilitation Act's employment provisions to Title I (but not to Title II), "[i]t would seem rather bizarre to find an employment cause of action in Title II of the ADA on the grounds that Title II is tied to the Rehabilitation Act, when the Rehabilitation Act itself ties its employment cause of action to Title I." *Bledsoe,* 942 F.Supp. at 1446.

In summary, the Rehabilitation Act does not provide a basis for interpreting Title II to apply to employment. To the contrary, the differences between that Act and Title II further support the conclusion that Congress did not intend for Title II to apply to employment.

## F. *Precedent*

We are mindful that most courts have held that Title II applies to employment. Ordi-

narily, we would find it difficult to hold that the wording of a statute *unambiguously* indicates a contrary congressional intent in the face of such precedent. However, those courts generally have ignored the wording of Title II altogether,[11] including the definition of "qualified individual with a disability" from that Title and the surrounding words in 42 U.S.C. § 12132. Instead, they have: (1) assumed without analysis that Title II applies to employment,[12] (2) relied only on the Attorney General's regulation and the legislative history of the ADA, without discussion of the statutory text and context,[13] (3) relied on the Rehabilitation Act without analyzing whether Congress intended to incorporate its prohibition against employment discrimination into *Title II,*[14] or (4) relied solely on the foregoing precedent without independent consideration of the problem.[15] Because of the limited

---

**11.** The major exception is the Eleventh Circuit's decision in *Bledsoe.* Like the cases listed *infra* at footnote 13, that court relied primarily on the ADA's legislative history and the Attorney General's regulation. *See Bledsoe,* 133 F.3d at 821–22. However, the court also justified its result with reference to the second clause of § 12132, which it described as a " 'catch-all phrase that prohibits all discrimination by a public entity.' " *Id.* at 822 (citation omitted); *see also Alberti,* 32 F.Supp.2d 1164, 1169 (relying on the second clause of § 12132); *Downs,* 13 F.Supp.2d at 135 (relying on the second clause of § 12132). However, for reasons that we already have discussed, we do not think that this reading of the statutory text is correct.

**12.** *See, e.g., Holmes v. Texas A & M Univ.,* 145 F.3d 681, 683–84 (5th Cir.1998); *Doe v. University of Maryland Med. Sys.,* 50 F.3d 1261, 1264–65 & n. 9 (4th Cir.1995); *Motto v. City of Union City,* No. 95–5678, 1997 WL 816509, at *8 (D.N.J. Aug. 27, 1997); *Davoll v. Webb,* 943 F.Supp. 1289, 1297 (D.Colo.1996); *Dertz v. City of Chicago,* 912 F.Supp. 319, 323–25 (N.D.Ill. 1995), *reconsidered in part on other grounds,* 1997 WL 85169 (Feb. 24, 1997); *Doe v. County of Milwaukee,* 871 F.Supp. 1072, 1074 (E.D.Wis. 1995); *Eisfelder v. Michigan Dept. of Natural Resources,* 847 F.Supp. 78, 83–84 (W.D.Mich. 1993); *Finley v. Giacobbe,* 827 F.Supp. 215, 219 n. 3 (S.D.N.Y.1993).

**13.** *See, e.g., Hernandez v. City of Hartford,* 959 F.Supp. 125, 133 (D.Conn.1997) ("On its face, Title II prohibits discrimination in 'public services'. A plain reading of the section does not reveal whether Title II covers employment discrimination addressed more specifically in Title

I. The regulations under and the legislative history of ADA Title II make it clear, however, that § 12132 prohibits employment discrimination by public entities on the basis of disability.") (footnote and citation omitted); *Wagner v. Texas A & M Univ.,* 939 F.Supp. 1297, 1309 (S.D.Tex.1996) ("Although it is not apparent from the plain language of § 12132, the regulations issued by the Department of Justice make it clear that the prohibition against discrimination by public entities includes employment discrimination."). *See also Winfrey v. City of Chicago,* 957 F.Supp. 1014, 1023 n. 7 (N.D.Ill.1997) (similar); *Silk v. City of Chicago,* No. 95 C 0143, 1996 WL 312074, *10 (N.D.Ill. June 7, 1996) (similar); *Benedum v. Franklin Township Recycling Center,* No. 95–1343, 1996 WL 679402, at *5 (W.D. Pa. Sept 12, 1996) (similar); *Petersen v. Univ. of Wisconsin Bd. of Regents,* 818 F.Supp. 1276, 1278 (W.D.Wis.1993) (similar).

**14.** *See, e.g., Bledsoe,* 133 F.3d at 821; *Alberti,* 32 F.Supp.2d at 1169–70; *Downs,* 13 F.Supp.2d at 135; *Ethridge,* 847 F.Supp. at 906.

**15.** *See, e.g., Saylor v. Ridge,* 989 F.Supp. 680, 688 (E.D.Pa.1998) ("We are inclined to follow the reasoning and holdings of our brethren which also appears to be the view followed by the majority of courts nationwide which have confronted this issue."). *See also Magee v. Nassau County Medical Center,* 27 F.Supp.2d 154, 159 (E.D.N.Y.1998) (similar); *Fobar v. City of Dearborn Heights,* 994 F.Supp. 878, 885 n. 3 (E.D.Mich.1998) (similar); *Bruton v. Southeastern Penn. Transp. Auth.,* No. 94–CV–3111, 1994 WL 470277, at *2 (E.D.Pa. Aug. 19, 1994) (similar).

analysis performed in those cases—in particular, their failure to consider the statutory text and context carefully—we simply do not find them persuasive.

## CONCLUSION

We realize that our decision creates an inter-circuit split of authority. Although we are hesitant to create such a split, and we do so only after the most painstaking inquiry, we must follow the unambiguously expressed intent of Congress. We therefore hold that Title II does not apply to employment.

AFFIRMED.