# Compliance of Direct Recording Electronic Voting Systems With Help America Vote Act and Americans With Disabilities Act

A direct recording electronic voting system that produces a contemporaneous paper record, which is not accessible to sight-impaired voters but which allows sighted voters to confirm that their ballots accurately reflect their choices before the system officially records their votes, would be consistent with the Help America Vote Act and with title II of the Americans with Disabilities Act, so long as the voting system provides a similar opportunity for sight-impaired voters to verify their ballots before those ballots are finally cast.

October 10, 2003

MEMORANDUM OPINION FOR THE
PRINCIPAL DEPUTY ASSISTANT ATTORNEY GENERAL
CIVIL RIGHTS DIVISION

This memorandum responds to your Office's request of August 12, 2003, for our opinion on whether a direct recording electronic ("DRE") voting system may, consistent with the Help America Vote Act and the Americans with Disabilities Act, produce a contemporaneous paper record, not accessible to sight-impaired voters, that allows voters to confirm that their ballots accurately reflect their choices before the system officially records their votes. Based on the information you have provided us, we conclude that this proposed voting system would be consistent with both Acts, so long as the DRE voting system provides a similar opportunity for sight-impaired voters to verify their ballots before those ballots are finally cast.[1]

## I.

Many states are expanding the use in elections of DRE voting systems, which allow voters to enter their choices on an electronic screen in the voting booth. The DRE machines also allow a voter to confirm his ballot before it becomes an officially recorded vote by providing a "summary screen" listing all of the voter's choices. After viewing the summary screen, the voter may either cast his ballot or else go back and make corrections. On newer DRE machines, an auditory component announces the ballot choices and the contents of the electronic

---

[1] In so concluding, we are not sanctioning the use of any particular DRE voting system. Indeed, our understanding of how such systems will actually work is necessarily limited by the fact that most of them are still at the design stage. The addition (or elimination) of certain features, or their use in particular ways, may result in a voting system that does not provide a similar opportunity for disabled voters to access and participate in the voting system. As explained in greater detail below, such a system would be inconsistent with the Help America Vote Act.

summary screen, allowing sight-impaired voters to verify and cast their ballots without assistance and in complete privacy.

In response to concerns that the DRE voting systems may be vulnerable to tampering, the State of California is considering adopting DRE machines that would produce a contemporaneous paper record for each voter in addition to the electronic summary screen. *See* Letter for Joseph Rich, Voting Section Chief, Civil Rights Division, from Randy Riddle, Chief Counsel, California Secretary of State (July 8, 2003). This paper record would summarize the voter's choices, and would be printed before the voter finally casts his ballot. In some cases, the paper record might also be preserved as a means to count votes in case of a recount or election contest. But in other cases, the paper record would serve solely to inform the voter of his choices before finally casting his ballot—serving the same function as the DRE electronic summary screen.

## II.

Because the paper record produced by the DRE machines in question will not be produced in a format accessible to sight-impaired voters, you have asked for our opinion whether such a voting system would violate either the Help America Vote Act or title II of the Americans with Disabilities Act. We will address each statute in turn.

## A.

Under the Help America Vote Act of 2002 ("HAVA"), all "voting systems" used in an election for federal office must meet specified federal requirements by January 1, 2006. *See* 42 U.S.C. §§ 15481–15485 (Supp. II 2003). One of these requirements is that voting systems "shall . . . permit the voter to verify (in a private and independent manner) the votes selected by the voter on the ballot before the ballot is cast and counted." 42 U.S.C. § 15481(a)(1)(A)(i). DRE voting systems comply with this mandate by providing a final summary screen before the voter asks the machine to officially record his vote, as well as an auditory component that informs sight-impaired and illiterate voters of the summary screen's contents. The production of a contemporaneous paper record is not necessary for the voting system to comport with section 15481(a)(1)(A)(i), but it does afford an additional means for a voter to verify his choices before casting his vote.

HAVA further provides that "[t]he voting system shall . . . be accessible for individuals with disabilities, including nonvisual accessibility for the blind and visually impaired, in a manner that provides *the same opportunity for access and participation* (including privacy and independence) as for other voters." 42 U.S.C. § 15481(a)(3)(A) (emphasis added). Some may object that sight-impaired voters will have no opportunity to access or use the contemporaneous paper records

generated by DRE machines, as the paper record is not produced in Braille, and the DRE systems do not currently convert the paper into an audible format accessible to the sight-impaired. We do not, however, believe that this feature contravenes section 15481(a)(3)(A).

What section 15481(a)(3)(A) requires is that each "voting system" be accessible to disabled persons in a manner that provides "the same opportunity" for access and participation that other voters have. We will assume for the sake of argument that the paper record produced by DRE machines is included as part of the "voting system" as defined in section 15481(b),[2] although we note that this is not entirely clear and may depend on precisely what functions the paper record serves beyond providing a means for voters to verify their ballots before they are cast.[3] But even if one indulges this assumption, the statutory issue would not be

---

[2] Section 15481(b) provides:

In this section, the term "voting system" means—

(1) the total combination of mechanical, electromechanical, or electronic equipment (including the software, firmware, and documentation required to program, control, and support the equipment) that is used—

(A) to define ballots;

(B) to cast and count votes;

(C) to report or display election results; and

(D) to maintain and produce any audit trail information; and

(2) the practices and associated documentation used—

(A) to identify system components and versions of such components;

(B) to test the system during its development and maintenance;

(C) to maintain records of system errors and defects;

(D) to determine specific system changes to be made to a system after the initial qualification of the system; and

(E) to make available any materials to the voter (such as notices, instructions, forms, or paper ballots).

42 U.S.C. § 15481(b) (emphasis added).

[3] Paper would appear not to be "mechanical, electromechanical, or electronic equipment." While 42 U.S.C. § 15481(b)(1) includes in its reach all "documentation" used to "support" such equipment, we do not think it likely that a paper record whose sole function is to allow voters to verify their choices would be "used" for any of the purposes delineated in section 15481(b)(1)(A)–(D). Another possible category for such a paper record is section 15481(b)(2)(E), but it is important to emphasize that the "notices, instructions, forms, or paper ballots" referred to in section 15481(b)(2)(E) are not themselves part of the "voting system"; rather, the "practices and associated documentation" used to make these materials available to the voter are part of the voting system.

A paper record that would also be used for auditing purposes in the event of a recount or election challenge is more likely to be part of the "voting system" in section 15481(b)(1), because it would be used to "count votes," 42 U.S.C. § 15481(b)(1)(B), as well as "to maintain and produce any audit trail information," *id.* § 15481(b)(1)(D).

This threshold issue will depend on the precise facts of each voting system, so we leave it for another day and assume, *arguendo*, that the paper record can be pigeonholed into one of the nine categories listed in 42 U.S.C. § 15481(b)(1)–(2).

whether the paper record is accessible to the sight-impaired, but whether the entire DRE voting system is accessible in a manner that provides disabled voters "the same opportunity for access and participation" that other voters enjoy. 42 U.S.C. § 15481(a)(3)(A). We must therefore evaluate a disabled person's opportunity to participate in the voting system holistically, rather than scrutinizing his opportunity to access the system's discrete components or parts.

Furthermore, the use of the word "same" in section 15481(a)(3)(A) does not mean "identical"; if HAVA were read to require an identical opportunity for access and participation among non-disabled voters and voters with every type of disability, it would mandate the impossible. A serious disability will necessarily result in a voting experience that differs in some manner from that enjoyed by non-disabled voters. Nothing can be done, for example, to enable blind voters to visually interact with their ballot as sighted voters can. And we do not read HAVA to force all sighted persons to use voting technology with no visual dimension whatsoever (such as a voice-activated box that navigates voters through the ballot via a series of audible commands). That approach would not comply with section 15481(a)(3)(A) because such a voting system, in its efforts to produce "identical" opportunities among the sighted and the blind, would be entirely inaccessible to the hearing-impaired. What is more, equating the word "same" in section 15481(a)(3)(A) with "identical" would prohibit the very audio components in DRE voting systems that enable the sight-impaired to vote in privacy, because voters with other types of disabilities, such as the hearing-impaired, could not access these accommodations and would therefore lack an identical "opportunity" to participate in the voting system. We therefore construe the word "same" to mean "similar in kind, quality, quantity, or degree." *See American Heritage Dictionary of the English Language* 1539 (4th ed. 2000). So long as a disabled person can access and participate in the essentials of a voting system—such as the ability to cast a ballot in privacy with a full opportunity to review the ballot before casting it—his opportunity to access and participate in the voting system is sufficiently "similar in kind, quality, quantity, or degree" to that enjoyed by non-disabled persons. The fact that the precise means by which he may access and participate in those essentials differs from those available to non-disabled persons does not deprive him of the "same opportunity" to participate in the voting system—if it did, no voting system could ever comply with HAVA.

So long as DRE voting systems provide sight-impaired voters with audio equipment that enables them to verify their ballots before they are cast, we conclude that the provision of a contemporaneous paper record to assist sighted voters in verifying their ballots does not run afoul of HAVA.[4] The essentials of such a voting system—including the ability to verify one's ballot—are available to disabled and non-disabled voters alike, giving them the "same opportunity" for

---

[4] This analysis assumes, of course, that the audio device, the summary screen, and the paper record are all reliable methods of verification.

access and participation under section 15481(a)(3)(A). Knowledge of the contents of the paper record is simply one of the *means* by which a sighted voter may verify his ballot before casting it, and DRE voting systems satisfy section 15481(a)(3)(A) so long as they provide a comparable means for sight-impaired voters to achieve this essential end.

It is true that sighted voters will have more than one method by which they may verify their ballot before casting it: they can view both the electronic summary screen as well as the paper record produced by the DRE machine. Sight-impaired voters, by contrast, can only listen to an audio description of the summary screen, and have no independent way of knowing the contents of the paper record before casting their vote. Nevertheless, we do not believe that providing a greater number of methods by which sighted voters can verify their ballots deprives blind voters of the "same opportunity" for access and participation in the voting system, so long as the means available to such disabled persons are adequate to ensure similar access to and participation in the essentials of the voting system. The ability to verify one's ballot before casting it *is* essential, *cf.* 42 U.S.C. § 15481(a)(1)(A)(i), but the availability of multiple techniques by which to do so is not. Disability accommodations often result in a greater range of methods by which non-disabled persons can accomplish their goals, yet such accommodations are not deemed to deny equal opportunities for disabled persons for that reason alone. Consider a building that provides both a set of stairs and a wheelchair ramp to its outdoor entrance. Non-disabled persons have more means to enter the building (they can use either the stairs or the ramp), while the wheelchair-bound person can use only the ramp. But no one would contend that such a building has deprived disabled persons of the "same opportunity" to access the building. That is because the essential requirement of access—the ability to get to the front door—is available to all. The means to achieve that end differ, and non-disabled persons have a greater number of options, but provision of the ramp suffices to provide disabled persons with a similar (though not "identical") opportunity. So too with the DRE voting systems, as you have described them.

## B.

Title II of the Americans with Disabilities Act ("ADA") provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (2000). Only a "qualified individual with a disability" ("QID")—defined as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services

or the participation in programs or activities provided by a public entity," *id.* § 12131(2)—is protected by title II.

The first task is to identify the relevant "service," "program," or "activity" at issue. This step is essential, because one cannot be a QID under section 12131(2) except in relation to a specific "service," "program," or "activity." A title II complainant must show that he meets the essential eligibility requirements either to receive a "service," or to participate in a "program" or "activity," provided by a public entity. Without such a showing, there can be no violation of section 12132.[5]

A title II complainant could plausibly assert that the paper record itself is a "service" that blind individuals are eligible to "receive." (The ADA does not define the term "services," but we will assume *arguendo* that "services . . . provided by a public entity" encompass the paper record produced by the DRE voting system.) All voters, disabled or not, receive the paper record any time they vote on a DRE machine, so there is no need to explore whether accommodations beyond the realm of reason are necessary to make such persons "eligible" to receive the paper record. *See* 42 U.S.C. § 12131(2). This suffices to establish a sight-impaired voter as a QID under section 12131(2), but title II is not breached unless the sight-impaired person is either denied the benefits of the paper record, or is subjected to discrimination by a public entity. *See id.* § 12132.

To the extent the paper record provides sighted voters with an opportunity to check their ballots, this does not deny a benefit to sight-impaired voters, because the DRE machines' auditory component already provides a means for such voters to verify their ballots before casting them. But more importantly, given that *all* voters were fully capable of confirming their ballot before the advent of paper-producing DRE machines (either by viewing the summary screen, or using the machine's audio capacity), we do not think the paper record provides any "benefit" at all in this regard. *See American Heritage Dictionary* 168 (defining "benefit" as "an advantage; help; aid"). We reject any construction of the term "benefit" in section 12132 that includes the provision of a means to accomplish a task that all persons could fully and effectively perform without such provision. In cases where the paper record is used by election officials for auditing purposes, this "benefit" of the paper record is not withheld from sight-impaired voters—all paper records, regardless of the voter's disability status, would be used in the event of a recount or election challenge and would protect the integrity of that voter's ballot.

---

[5] At least one decision from a court of appeals has disclaimed any need to determine whether a government function can be characterized as a "service," "program," or "activity" when adjudicating title II claims. *See Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002) ("Attempting to distinguish which public functions are services, programs, or activities, and which are not, would disintegrate into 'needless hair-splitting arguments.'") (citation omitted). For the reasons explained above, this approach cannot be reconciled with the text of title II. Nor can it be reconciled with *Zimmerman v. Oregon Department of Justice*, 170 F.3d 1169, 1174–76 (9th Cir. 1999), which *Barden* did not cite.

A sight-impaired voter could also claim that voting is a "program" or "activity" in which he is eligible to participate. *See* 42 U.S.C. § 12131(2). But however one defines the "benefits" of voting, we cannot see how the provision of a paper record denies these "benefits" to sight-impaired QIDs. Even if the paper record is utterly useless to sight-impaired voters, those voters still enjoy every "benefit" of voting that they would have had under the non-paper-producing DRE machines. One might contend that our understanding of the "benefits" of voting should vary depending on the technology employed, and that the "activity" of voting on a paper-producing DRE machine includes added "benefits" unknown to those voting on other equipment. But even under this approach, the only conceivable "benefit" that one might claim is denied to sight-impaired voters is the provision of multiple means by which to verify one's ballot. For the reasons explained above, we do not regard this as a "benefit" under section 12132. The Attorney General has emphasized that section 12132 does not require a public entity to make each of its existing facilities accessible to individuals with disabilities when administering a service, program, or activity, *see* 28 C.F.R. § 35.150(a)(1) (2003), which confirms our view that the failure to make each and every means of access or participation available to disabled persons is not the "denial of a benefit" under section 12132.

As to whether sight-impaired voters are "subject to discrimination" by a public entity that uses the DRE voting system: the DRE machines indeed treat sight-impaired voters differently, as they must engage an auditory component while voting, while sighted persons can simply look at the screen. Mere dissimilar treatment, however, does not by itself constitute "discrimination" under title II. All disability accommodations treat the disabled differently than non-disabled persons, but section 12132 does not prohibit the very accommodations mandated by the ADA. *See* 28 C.F.R. § 35.130(c) ("Nothing in this part prohibits a public entity from providing benefits, services, or advantages to individuals with disabilities"). Rather, to be "subjected to discrimination" under section 12132, a QID must not only be treated differently, but the discrimination must also leave the QID worse off than if the dissimilar treatment had never occurred. *See Olmstead v. Zimring*, 527 U.S. 581, 599–601 (1999) (concluding that unjustified institutional isolation of persons with disabilities is "discrimination" under section 12132 because it "perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life" and "severely diminishes the everyday life activities of individuals"). We think that any dissimilar treatment of QIDs resulting from a public entity's decision to use handicapped-accessible voting equipment falls into the category of permissible accommodation, rather than impermissible "discrimination," under title II of the ADA.

SHELDON BRADSHAW
*Deputy Assistant Attorney General*
*Office of Legal Counsel*