**John FILUSH**

v.

**TOWN OF WESTON**

**No. CIV.A. 302CV1934(SRU).**

United States District Court,
D. Connecticut.

May 6, 2003.

Gary Edward Phelan, Klebanoff & Phelan, PC, West Hartford, CT, for Plaintiff.

Gary S. Starr, Gabriel Joseph Jiran, Shipman & Goodwin, Martha Anne Shaw, Michael J. Rose, Alexandria L. Voccio, Howd & Ludorf, Hartford, CT, for Defendant.

### *RULING ON DEFENDANT'S MOTION TO DISMISS*

UNDERHILL, District Judge.

John Filush ("Filush") brought this lawsuit against the Town of Weston ("the Town") alleging two claims under Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12132 ("ADA"), and Section 504 of the Federal Rehabilitation Act of 1973, 29 U.S.C. § 794, ("Section 504 "). Filush alleges that the Town failed to reasonably accommodate his dyslexia in administering a promotion examination, failed to keep medical information related to his disability confidential, and manipulated the promotion process to ensure that he was not promoted, all in violation of Title II of the ADA. Filush alleges that the Town violated Title V of the ADA by retaliating against him by denying him a fair opportunity for promotion because he re-quested an accommodation for his disability. Filush alleges that the Town's actions also violated Section 504.

The Town filed this Motion to Dismiss, arguing that counts one and two of the complaint fail to state a claim upon which relief may be granted, and that this court lacks subject matter jurisdiction.

*Background*

Filush began working for the Town as a police officer in 1978. Filush took the promotional exam for Sergeant in 1990, 1993, 1994, and 1995. Each time, he was not promoted. In January 2000, he was diagnosed with dyslexia and impaired visual memory skills. His condition diminished his ability to rapidly execute written tasks and required extended time in standardized testing situations. Filush's condition qualifies as a disability under the ADA.

In January 2000, Filush sent a confidential memorandum to the Town's Chief of Police, Anthony P. Land, stating that he had a condition that entitled him to certain testing accommodations under the ADA. Filush requested extended time to obtain books on tape, extended time to review required reading materials, limited use of the multiple choice testing format, a quiet test site, un-timed testing, and a spelling exemption.

On January 7, 2000, Chief Land sent a memorandum to Filush requesting medical information from Filush's health care provider explaining the nature of Filush's disabilities and an explanation for why the requested accommodations were necessary to provide Filush with a fair opportunity to take the promotional examination. Chief Land's memorandum assured Filush that his medical information would be shared only on a "need-to-know" basis.

On January 25, 2000, Robert S. Kruger, Ph.D., wrote a letter to Chief Land detail-

ing Filush's disabilities. Kruger also stated that Filush's disabilities would impair his performance on any written task requiring rapid execution, and that Filush would be at a disadvantage in competing against non-disabled candidates on a standardized examination. Kruger indicated that a reasonable accommodation for Filush's disabilities would have to include the provision of extended time to complete an examination.

On or about February 29, 2000, Chief Land wrote a memorandum to Filush confirming the terms under which Filush would take the Sergeant's examination scheduled for March 22, 2000. Chief Land stated that Filush would be allowed 50% more time to complete the written examination.

On March 20, 2000, Filush discovered that a co-worker had learned of his disability accommodation for the upcoming examination. Filush requested a meeting with the Town's ADA representative and also requested that Chief Land's office conduct an investigation to determine how Filush's confidential disability-related information was obtained by the co-worker.

On or about March 22, 2000, Filush took the Sergeant's examination. He was allowed an additional hour in which to complete the examination. Six other individuals sat for the exam. Filush ranked second among the candidates. However, another candidate was selected for the Sergeant position. Filush alleges that he was also passed over for other informal leadership opportunities within the police department.

On June 4, 2002, the Police Commission issued a memorandum entitled "Candidate Interview Procedure," which detailed six procedures that would be used in subsequent promotion interviews. On June 10, 2002, Chief Land circulated a memorandum to all officers indicating the dates of the upcoming Sergeant's examination and other details concerning the selection process. On June 15, 2002, Filush filed a grievance indicating that the six procedures outlined in the Commission's memorandum were in violation of Article XXVI of the union contract regarding promotions. On June 17, 2002, Chief Land sent a letter to Filush asking him to clarify the manner in which the Candidate Interview Procedure violated the union contract. Filush responded on June 27, 2002, and his response was submitted to the Commission.

On June 30, 2002, Filush requested that he be provided with the study skills materials provided to other officers competing for the Sergeant's position. Filush alleges that Chief Land responded that he had given Filush the study materials over a year ago and requested that they be returned because Filush had "had more than [his] share." Compl. at ¶ 48.

On July 24, 2002, Filush requested testing accommodations for the upcoming Sergeant's examination. On August 6, 2002, Filush sat for the written portion of the Sergeant's exam and was given an additional hour in which to complete the examination.

Filush contends that Chief Land sent a letter to Lieutenant Mark Grecco regarding the oral component of the Sergeant's exam. Filush alleges that Chief Land, in his letter, encouraged Grecco to probe candidates on technical issues relating to the Sergeant position's staff support role and the candidates' long-term commitment and problem-solving abilities. Filush's combined written and oral scores ranked him fourth among the candidates. Because he was not ranked in the top three, Filush was not considered for Sergeant. Filush alleges that the successful candidate had been given special assignments by Chief

Land, and that those assignments were similar to the staff support duties that the Sergeant position entailed. This experience, Filush contends, was critical in the candidate's successful performance in the oral component of the examination.

*Standards of Review*

### A. Rule 12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction

A plaintiff bears the burden of proving the existence of subject matter jurisdiction by a preponderance of the evidence. *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir.2000). In considering a motion to dismiss for lack of subject matter jurisdiction, a court must "accept as true all material factual allegations in the Complaint and refrain from drawing inferences in favor of the party contesting jurisdiction." *Serrano v. 900 5th Ave. Corp.*, 4 F.Supp.2d 315, 316 (S.D.N.Y.1998) (citations omitted). The Court may consider evidence outside the pleadings, such as affidavits and other documents. *See Makarova*, 201 F.3d at 113.

### B. Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim

When considering a Rule 12(b)(6) motion to dismiss, "the court must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff." *Bolt Electric Inc. v. City of New York*, 53 F.3d 465, 469 (2d Cir. 1995) (citations omitted). Further, "[t]he district court should grant such a motion only if, after viewing plaintiff's allegations in this favorable light, 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Id.* (quoting *Walker v. City of New York*, 974 F.2d 293, 298

(2d Cir.1992), and *Ricciuti v. New York Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991)). "The issue is not whether a plaintiff is likely to prevail ultimately, 'but whether the claimant is entitled to offer evidence to support the claims.'" *Gant v. Wallingford Board of Ed.*, 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). When deciding a motion to dismiss, a court may consider not only the complaint, but also "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *See Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir.1991).

*Discussion*

### A. Applicability of Title II to Employment Discrimination Claims

■ The First Count of the Complaint alleges claims brought under Title II of the ADA. The Town argues that Title II does not apply to claims of employment discrimination and that Title I is the appropriate vehicle for such claims. Because Filush has not brought these claims under Title I, and thus, has not exhausted Title I's administrative remedies, the Town moves to dismiss these claims for lack of subject matter jurisdiction. Filush argues that Title I and Title II are distinct but equally viable alternatives for a public employee to seek relief from unlawful disability discrimination. The question before the court then is whether Title II encompasses employment discrimination claims made against a local governmental entity.

The Justice Department interprets Title II as prohibiting employment discrimination,[1] while courts addressing the issue are split, with a majority agreeing with the Justice Department. *See Dominguez v. City of Council Bluffs*, 974 F.Supp. 732,

---

1. 28 C.F.R. § 35.140(a) ("No qualified individual with a disability shall, on the basis of disability, be subjected to discrimination in employment under any service, program, or activity conducted by a public entity.").

736 (S.D.Iowa 1997) (noting split of authority and following the majority view); *cf. Zimmerman v. Oregon Dep't of Justice,* 170 F.3d 1169 (9th Cir.1999) (acknowledging the split and declining to follow the majority view); *Bledsoe v. Palm Beach Soil and Water Conservation Dist.,* 942 F.Supp. 1439, 1443 (S.D.Fla.1996) (listing cases and concluding that the majority view is inconsistent with the ADA). The Second Circuit has not directly addressed the issue, although other district courts within the District of Connecticut have considered the issue and followed the majority view. *See Worthington v. City of New Haven,* 1999 WL 958627 (D.Conn. Oct. 5, 1999); *Hernandez v. Hartford,* 959 F.Supp. 125 (D.Conn.1997). Although reluctant to depart from the rulings of other courts in the district, I decline to follow the majority view. In my view, the plain language of Title II, read in the context of the overall ADA statutory scheme, forecloses the possibility of allowing the plaintiff to bring an employment discrimination claim under Title II.

The ADA contains five titles: Employment (Title I), Public Services (Title II), Public Accommodations and Services Operated by Private Entities (Title III), Telecommunications (Title IV), and Miscellaneous Provisions (Title V). Americans with Disabilities Act of 1990, Pub.L. No. 101–336 (1990). As the titles suggest, Title I applies specifically to employment and provides that:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment.

42 U.S.C. § 12112(a). Neither party disputes that Title I ordinarily would apply to Filush's action. Title I, however, incorporates the administrative procedures of Title VII and requires that an employee first file a charge with the EEOC in a timely manner. *See* 42 U.S.C. § 12117(a) (incorporating Title VII's charge requirement).

Title II of the ADA pertains to Public Services. Congress required the Attorney General to promulgate regulations implementing Title II. *See* 42 U.S.C. § 12134(a). Pursuant to that grant of authority, the Attorney General has determined that Title II of the ADA also applies to employment:

> No qualified individual with a disability shall, on the basis of disability be subjected to discrimination in employment under any service, program, or activity conducted by a public entity.

28 C.F.R. § 35.140(a) (1998). Filush contends that the agency's regulation interpreting Title II's anti-discrimination clause is dispositive and allows employment discrimination claims to be brought under Title II. The Town, conversely, contends that no weight is to be given to the agency regulations because the plain language of the statute clearly indicates Congress' intent to restrict employment discrimination claims to Title I.

Under these circumstances, *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), governs a court's review of an agency regulation interpreting a statute. In *Chevron,* the Supreme Court devised a two-step approach for reviewing an administrative agency's interpretation of a statute it administers. 467 U.S. at 842–44, 104 S.Ct. 2778. The first step of a *Chevron* analysis requires the court to employ "traditional tools of statutory construction" to determine whether Congress has expressed its intent unambiguously on the question presented before the court. 467 U.S. at 843 n. 9, 104 S.Ct.

2778. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. 2778. If Congress has left a gap for the administrative agency to fill, the second step of the *Chevron* analysis requires the court to uphold the administrative agency's regulation interpreting the statute unless it is "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844, 104 S.Ct. 2778. Here, the court's inquiry ends with the first step of the *Chevron* analysis because Congress unambiguously expressed its intent that Title II not apply to employment.

When interpreting a statute, the court "generally look[s] first to the plain language of a statute and interpret[s] it by its ordinary, common meaning." *Luyando v. Grinker,* 8 F.3d 948, 951 (2d Cir.1993). Title II's operative section provides:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. The section's first clause provides that no qualified individual with a disability may be excluded from participation in or denied the benefits of the services, programs, or activities of a public entity. The phrase "services, programs, or activities ... focuses on a public entity's outputs rather than its inputs." *Decker v. University of Houston,* 970 F.Supp. 575, 578 (S.D.Tex.1997).

■ If asked what services, programs, and activities it provided, the Town might respond that it provided basic municipal services such as public education, public transportation, or law enforcement. It

would not answer that it hired teachers, bus drivers, and police officers. *See Zimmerman,* 170 F.3d at 1174. ("[E]mployment by a public entity is not commonly thought of as a 'service, program, or activity of a public entity.'"). These municipal services are considered the Town's "outputs," while the personnel and equipment engaged to provide such services would be considered the Town's "inputs." The latter are not services or programs that citizens seek to participate in or receive benefits from; they are conduits used by the public entity to provide services, programs, and activities.

Here, Filush is not contending that he sought to avail himself of a public service, such as the use of public transportation, administered by the Town. Instead, he argues that the Town, as his employer, violated his rights as an employee. Essentially, Filush's claims relate to his treatment as an "input," not on discrimination incurred while trying to take advantage of the Town's "outputs." The wording of the section's first clause does not suggest that Congress intended for Title II to apply in such a situation.

The second clause of Title II states that "no qualified individual with a disability shall, by reason of such disability, ... be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Some courts have held that the second clause is independent from the first and that it prohibits *any* form of discrimination by a public entity. *See Bledsoe v. Palm Beach County Soil & Water Conservation Dist.,* 133 F.3d 816, 822 (11th Cir.1998); *Innovative Health Sys., Inc. v. City of White Plains,* 117 F.3d 37, 44–45 (2d Cir.1997) (holding that Title II's anti-discrimination provision was intended as "a catchall phrase that prohibits all discrimination by a public en-

tity, regardless of context.").[2]

Such a broad interpretation, however, seems far beyond Congress' intentions for Title II. As the Ninth Circuit observed in *Zimmerman v. Oregon Department of Justice*, 170 F.3d 1169 (9th Cir.1999), the second clause of section 12132 appears to "relate[ ] back to the same 'services, programs, and activities' of a public entity that the first clause covers." *Id.* at 1175. The Ninth Circuit also noted that the legislative heading for Title II, "Public Services," suggests that it was intended to pertain only to the provision of public services. *Id.* (citing *Almendarez–Torres v. United States*, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998)) ("[T]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute.").

■ In addition to the placement of the second clause and the section heading, the remaining text of Title II strongly suggests that Congress intended for it to apply only to the provision of public services. As the Ninth Circuit noted in *Zimmerman*, to prevail on a Title II claim, a plaintiff must prove that he is a "qualified individual with a disability." 170 F.3d at 1175. Congress has defined the term "qualified individual with a disability" to apply to "an individual with a disability who . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C.

§ 12132(2). Under subsection 12132(2), a plaintiff is not qualified to bring a Title II claim unless he "meets the essential eligibility requirements" established for the receipt of services, programs, or activities provided by a public entity. Thus, the second clause of section 12132 thus pertains to the provision of government services; if it did not, a plaintiff would not be qualified to bring a claim under that clause. Again, "service, programs and activities of a public entity" refers to public services—a public entity's outputs. It does not refer to obtaining or retaining employment with a public entity.

Accordingly, the second clause of Title II's anti-discrimination clause, like the first clause, prohibits discrimination only in a public entity's provision of its outputs. The plain language of 42 U.S.C. § 12132 does not "permit the inference that Congress intended for Title II to apply to employment." *Zimmerman*, 170 F.3d at 1176.

Even if the plain language of Title II were ambiguous, the statutory scheme of the ADA demonstrates that Title II was not intended to apply to employment. Specifically, of the ADA's five titles, only Title I is expressly designated as pertaining to employment and contains detailed, comprehensive employment-related provisions. 42 U.S.C. § 12111. Indeed, Title II contains no employment-related provisions and instead, refers only to the "ser-

---

**2.** Filush relies heavily on *Innovative Health Systems* to support his argument that Title II was intended to be broad and all-encompassing, rather than limited to the provision of services, programs, and activities. *Innovative Health Systems*, however, is distinguishable from the case at bar. In *Innovative Health Systems*, the Second Circuit addressed the issue of whether a city's zoning activities were within the ambit of Title II. The case did not pertain to the issue of employment, which raises broader statutory interpretation issues

given the fact that employment discrimination under the ADA is explicitly governed by Title I. Moreover, *Innovative Health Systems* was decided in 1997. Since then, other circuits have considered the issue currently presented in this case—whether Title II encompasses employment discrimination claims by public employees. The analysis presented by the decisions of those other courts would likely prove persuasive to the Second Circuit in ruling on the specific question at issue here.

vices, programs, and activities" of public entities. 42 U.S.C. § 12132. Even the definitions of terms common to both titles vary in order to accommodate each title's specific focus. For example, in Title I, the term "qualified individual with a disability" refers to a person's qualifications to work and be employed. 42 U.S.C. § 12111(8). In Title II, the term "qualified individual with a disability" refers to a person who is eligible to receive services or participate in programs or activities provided by a public entity. 42 U.S.C. § 12131(2). Similarly, Title I contains the term "reasonable accommodation," which specifically refers to the needs of the disabled in the workplace. 42 U.S.C. § 12111(9). Title II contains the term "reasonable modification," but provides no definition or any context that would associate the term with employment. 42 U.S.C. § 12131.

■ The plain language of the two titles reveals their intended, distinct applications. It is axiomatic that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983). Here, Congress labeled Title I "Employment" and included a series of provisions that provide detailed information on the accommodation and inclusion of disabled persons in the workplace. Conversely, Title II contains no references to the employment of disabled persons. The plain language of the two titles indicates that Congress purposely included references to employment in Title I, and omitted them from Title II, because it intended that only Title I should apply to employment.

This reading of the statute is supported by the impracticality of allowing employment-related claims to proceed under both titles. The employment practices of state and local government entities are already governed by the provisions of Title I. "To hold that Title II also governs their employment practices would render Congress' special effort to ensure their inclusion in Title I superfluous." *Zimmerman* at 1177. Moreover, allowing claims of employees of state and local governments to be brought under Title II would allow such employees to circumvent the administrative procedures required under Title I. Such a result would essentially render Title I inapplicable to claims by public employees, who could seek relief under Title II, rather than submit to the procedural requirements and limitations of Title I.[3] Additionally, allowing employment claims under both titles would grant public employees an exemption from the time limits for filing claims under Title I. It is unlikely that Congress intended to permit public employees multiple avenues by which to bring claims, while allowing private employees only the procedures provided under Title I.

■ When viewed holistically, the text, structure, and context of the ADA all demonstrate that Congress did not intend for Title II to apply to employment. Under such circumstances, the court need not consider legislative history[4] or administra-

**3.** In addition to the exhaustion requirement, Title I incorporates by reference the procedural requirements of Title VII and maintains caps on damages available to successful plaintiffs. *See* 42 U.S.C. § 12117(b) (incorporating by reference 29 U.S.C. § 701 et seq.); 42 U.S.C. § 1981a(b)(3)(B) (providing for caps on punitive damages). Title II does not impose these requirements and limitations.

**4.** Some courts have considered Title II's legislative history and found that the "legislative commentary regarding the applicability of Title II to employment discrimination, however,

tive regulations in interpreting the statute. *Chevron* at 842–43, 104 S.Ct. 2778.

Title II was not intended to apply to claims of employment discrimination. Rather, Filush's claims should have been brought under Title I. Because Filush did not bring his claims under Title I and, thus, did not exhaust the administrative requirements of Title I, this court lacks subject matter jurisdiction to hear employment discrimination claims. Accordingly, Count One of the Complaint is dismissed.

*B. Disclosure of Confidential Medical Information*

 Filush alleges that the defendant failed to keep confidential certain medical information relating to his disability, as required by the ADA's regulations set forth at 28 C.F.R. § 1630.14(c). The Town argues that this claim must fail because it was brought under Title II and the cited regulation refers only to Title I.

The ADA provides for the issuance of administrative regulations by various agencies. *See* 42 U.S.C. § 12116; 42 U.S.C. § 12134. The EEOC was charged with promulgating regulations concerning Title I, which relates to equal employment opportunities for individuals with disabilities. Those regulations are set forth 28 C.F.R. § 1630, *et seq.* The Department of Justice ("DOJ") was responsible for promulgating regulations for Title II, which pertains to non-discrimination on the basis of disability in the provision of public services. Those regulations are set forth at 28 C.F.R. § 35.140.

The DOJ's Title II regulations cross-reference Title I in outlining the standards by which to assess claims of employment discrimination brought under Title II:

> For purposes of this part, the requirements of title I of the Act, as established by the regulations of the Equal Employment Opportunity Commission in 29 CFR part 1630, apply to employment in any service, program, or activity conducted by a public entity if that public entity is also subject to the jurisdiction of title I.

28 C.F.R. § 35.140(b)(1). Filush claims that, because the DOJ regulations enforcing Title II expressly adopt the EEOC's regulations governing Title I of the ADA, when the public entity is acting as an employer, he may pursue a Title II claim based on a violation of the EEOC's regulations. Such a conclusion, however, is irreconcilable with the determination, discussed above, that Congress did not intend for Title II to apply to employment discrimination claims. In assuming that employment discrimination claims are within the purview of Title II, the DOJ regulations contradict the intent of the statute and cannot provide a basis for Filush's employment discrimination claims. *See Foster v. Celani*, 849 F.2d 91, 92 (2d Cir.

is so pervasive as to belie any contention that Title II does not apply to employment actions." *Bledsoe v. Palm Beach Cty. Soil and Water Conservation Dist.*, 133 F.3d 816 (11th Cir.1998). The Committee Report, however, is not dispositive. Indeed, the Report states only that the Committee chose "not to list all the types of actions that are included within the term 'discrimination,'as was done in title I and III, because this title essentially simply extends the anti-discrimination prohibition embodied in section 504 to all actions of state and local governments." A reading of this

explanation does not require the conclusion that Congress intended for Title II to apply to employment discrimination claims, as the Eleventh Circuit reasoned in *Bledsoe*. Indeed, this explanation could simply mean that Congress intended for the basic anti-discrimination principles embodied in titles I and III to extend to a public entity's provision of services, programs, and activities. In any event, because the plain language of the statute is unambiguous, this court need not consider statements contained in the statute's legislative history.

1988) (holding that regulations that contravene congressional intent cannot be upheld); *Insurance Co. of North America v. Gee,* 702 F.2d 411 (2d Cir.1983). Accordingly, Filush's claim regarding disclosure of medical information must be dismissed.

### C. Retaliation

The Town moves to dismiss the second count of Filush's complaint, which alleges that the defendant retaliated against Filush because he requested reasonable accommodations for his learning disability, on the ground that Filush has failed to establish a prima facie case of retaliation under the ADA.

At oral argument on April 28, 2003, Filush's counsel acknowledged that the retaliation claim, like the claim involving the alleged disclosure of Filush's confidential medical information, was inextricably linked to the overarching question of whether Title II was intended to encompass employment discrimination claims. Because this court holds that Title II does not encompass employment discrimination claims, Filush's retaliation claim, which was brought under Title II, is also dismissed.

### D. Punitive Damages

Pursuant to *Barnes v. Gorman,* 536 U.S. 181, 122 S.Ct. 2097, 153 L.Ed.2d 230 (2002), in which the Supreme Court held that punitive damages were not available under either Section 504 of the Rehabilitation Act or Title II of the ADA, Filush withdraws his claims for punitive damages.

### Conclusion

For the reasons stated above, Defendant's Motion to Dismiss Count One of the Complaint for lack of subject matter jurisdiction is GRANTED. Defendant's Motion to Dismiss Count Two of the Complaint is also GRANTED. Plaintiff's claims brought under section 504 of the Rehabilitation Act are not affected by this ruling and remain pending.

It is so ordered.