FILED
United States Court of Appeals
Tenth Circuit

September 11, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

JUDY ELWELL,

      Plaintiff-Appellant,

v.

STATE OF OKLAHOMA, ex rel.,
BOARD OF REGENTS OF THE
UNIVERSITY OF OKLAHOMA,

      Defendant-Appellee.

No. 11-6061

**Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. 5:10-CV-01169-C)**

Courtney D. Powell of Lester, Loving & Davies, P.C., Edmond, Oklahoma, for
Plaintiff-Appellant.

Shawnae E. Robey, Office of Legal Counsel, University of Oklahoma (Matthew
R. Stangl with her on the brief), Norman, Oklahoma, for Defendant-Appellee.

Before **GORSUCH, HOLMES,** and **MATHESON**, Circuit Judges.

**GORSUCH**, Circuit Judge.

Does the Americans with Disabilities Act create two separate but

overlapping causes of action for employment discrimination? Everyone agrees

Title I of the ADA authorizes the disabled to bring employment discrimination claims: it discusses the issue at length and in detail. But can a party bring an employment discrimination claim under Title II as well? Even though Title II never mentions employment and expressly seeks instead to root out discrimination against the disabled in the provision of public services? Judy Elwell tried to convince the district court Title II does this duplicative work, but that court disagreed, and in the end we must too.

For years, Ms. Elwell worked at the University of Oklahoma. It was mostly an office job — researching and writing, taking notes and typing. Relatively recently, Ms. Elwell began to suffer from a degenerative spinal disc condition. While she says her disability didn't prevent her from performing the essential functions of her job, she did seek certain accommodations from her employer. Her amended complaint doesn't tell us what those requested accommodations were, but it does charge the University with refusing to provide them — and, what's worse, ultimately firing her because of her disability.

All this led Ms. Elwell to file suit. She alleged violations of both Title II of the ADA, 42 U.S.C. § 12101 *et seq.*, and the Oklahoma state Anti-Discrimination Act (OADA), Okla. Stat. tit. 25, § 1301 *et seq.* The district court, however, soon dismissed her amended complaint, holding that Title II does not provide a cause of action for employment discrimination and that Oklahoma had not waived its immunity from suit under the OADA.

Starting with her federal claim first, there's no dispute that Title I of the ADA permits actions for employment discrimination. But what's less clear is whether Title II does the same thing. Ms. Elwell insists the answer is yes; the University and the district court are sure the answer is no. Though the ADA was originally enacted in 1990, the question remains an open one in this circuit. We've highlighted the question before, but not yet decided it. *See Davoll v. Webb*, 194 F.3d 1116, 1130 (10th Cir. 1999). Today, we must.

In approaching the question, we begin as always with the language of the statute. Most specifically, it says this:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.

As comes apparent enough from its grammar, the statute contains two primary clauses. The first prevents "qualified individual[s] with a disability" from being "excluded from participation in or be[ing] denied the benefits of the services, programs, or activities of a public entity." The second prevents "qualified individuals" from being "subjected to discrimination by" the public entity. Everyone before us agrees that the University *is* a "public entity" for purposes of Title II. So the remaining

- 3 -

question we face is whether one, both, or neither of these clauses gives rise to a cause of action for employment discrimination.

Beginning with the first clause, the question it poses is this: can "employment" be described fairly as a service, program, or activity of a public entity like the University? We think not. Ordinarily speaking, an agency's services, programs, and activities refer to the "outputs" it provides some public constituency. The phrase does not refer to the "inputs," like employees, needed to make an agency's services, programs, and activities possible. A university's services, programs, and activities might include courses in Bach, biophysics, or basket weaving — outputs provided to its students — but not the professors, piano tuners, or other people needed to make those offerings possible. Employing people isn't a service, program, or activity the university provides: it is a means or method the university uses to provide its services, programs, and activities. On this much, nearly every court to have faced the question agrees, holding the plain language of the first clause of § 12132 does *not* reach employment.[1]

---

[1] *See, e.g.*, *Zimmerman v. Or. Dep't of Justice*, 170 F.3d 1169, 1174 (9th Cir. 1999); *Canfield v. Isaacs*, 523 F. Supp. 2d 885, 889-90 (N.D. Ind. 2007); *Brettler v. Purdue Univ.*, 408 F. Supp. 2d 640, 655-56 (N.D. Ind. 2006); *Cormier v. City of Meriden*, No. 03CV1819, 2004 WL 2377079, at *3-4 (D. Conn. Sept. 30, 2004); *Filush v. Town of Weston*, 266 F. Supp. 2d 322, 328-29 (D. Conn. 2003); *Decker v. Univ. of Houston*, 970 F. Supp. 575, 578 (S.D. Tex. 1997). In fact, the parties cite no authority on the other side of the ledger and our research has turned up only one district court case, *Dominguez v. City of Council Bluffs*,

(continued...)

A close look at the statutory terms confirms their point. "Services" are ordinarily understood as acts "done for the benefit . . . of another." *Webster's Third New International Dictionary* 2075 (2002); *see also* 15 *Oxford English Dictionary* 34 (2d ed. 1991) ("The work or duty of a servant; the action of serving a master."). We don't doubt that universities undertake a wide range of acts designed to benefit their students, both in the classroom and beyond. A university may offer academic instruction, meals and living quarters, even places to play and make friends — doing all of these things to benefit its students. A university may employ people as a means to provide these benefits. But one doesn't usually think of employing people as itself a benefit a university seeks to provide, as some sort of end in and of itself.

Much the same might be said of the term "program." The statute says that disabled persons may not be denied the right to "participat[e] in" or receive the "benefits of" a public entity's "programs." As a matter of plain language, this surely prohibits a public entity from denying access to

[1](...continued)
974 F. Supp. 732 (S.D. Iowa 1997), that does not address the plain language understanding adopted by all these other courts. To be sure, in *Currie v. Group Insurance Commission*, 290 F.3d 1, 6-7 (2002), the First Circuit did say that "[t]he words 'public services, programs, or activities' do not necessarily exclude employment." But it did so only in passing and without offering any detailed textual analysis of Title II. Indeed, it ultimately declined to decide the question, resolving the case on entirely separate grounds.

a public program like social security. Or, in the university context, denying access to, say, a foreign exchange program. But we don't ordinarily understand employees who help make programs possible as themselves participating in or receiving their benefits. The phrase "programs of a government entity" refers to its "project[s] or scheme[s]," *Webster's*, *supra*, at 1812; *see also* 12 *Oxford English Dictionary*, *supra*, at 589 ("a planned series of activities or events") — not, usually at least, to the employment of those needed to effect an agency's projects and schemes.

Now, one might well wonder whether the term "activity" might bear a broader meaning. In one sense, after all, the term "activity" could encompass anything a public entity *does*. *See Webster's*, *supra*, at 22 (defining "activity" as "natural or normal function or operation"). But a statutory term often takes on a shade of meaning by the company it keeps. *See Freeman v. Quicken Loans, Inc.*, 132 S. Ct. 2034, 2042 (2012) ("[T]he commonsense canon of *noscitur a sociis* . . . counsels that a word is given more precise content by the neighboring words with which it is associated"). And here the placement of the term "activity" suggests an effort to capture all the outputs the public entity provides to the public it serves, to be comprehensive in that respect, not necessarily to rope in everything the entity does. After all, if *that* were the point the earlier listed terms "services" and "programs" would become superfluous, eaten up by

the all-encompassing term "activities," and we are always hesitant to assume Congress included pointless language in its statutory handiwork. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that . . . no clause, sentence, or word shall be superfluous . . . ." (internal quotation marks omitted)).

Tending to confirm our understanding of the term "activity" and the whole of the first clause is this. If Congress had wanted to prohibit discrimination in *all* aspects of a public entity's operations, it easily could have said just that — indeed, it has in other anti-discrimination statutes. *See, e.g.*, 20 U.S.C. § 1687(1)(A) (Title IX) (defining "program or activity" to mean "all of the operations of . . . [any] instrumentality of a State or of a local government"); 29 U.S.C. § 794(b)(1)(A) (Rehabilitation Act) (same). The fact Congress chose different language in Title II strongly suggests a different meaning at work. *See N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 530 (1982) ("[A]lthough two statutes may be similar in language and objective, we must not fail to give effect to the differences between them.").

But even if the first clause of § 12132 doesn't encompass employment discrimination claims, we still must ask: what about the second? Ms. Elwell argues that the phrase "or be subjected to discrimination by any such entity" is a

"catch-all" prohibiting discrimination by a public entity, regardless whether it occurs in a service, program, or activity the entity provides or in some other way or function. On this view, the second clause effectively applies the ADA's anti-discrimination mandate to *any* operation of a public entity, including employment.

An attractive possibility at first blush, but this reading has a serious problem of its own. Remember that § 12132 prohibits discrimination only against "qualified individuals." In § 12131(2), Congress defines "qualified individual[s]" to include only those "individual[s] with a disability who . . . meet[] the essential eligibility requirements for the receipt of *services* or the participation in *programs* or *activities* provided by a public entity." 42 U.S.C. § 12131(2) (emphases added). And, as we have already explained, virtually every court to face the question has interpreted the words "services," "programs," and "activities" in § 12132 to mean an agency's "outputs." Neither do we see any plausible way to give these words an entirely different meaning barely a page away in § 12131. *See Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (noting the "normal rule of statutory construction that identical words used in different parts of the same act are [presumed] to have the same meaning." (internal quotation marks omitted)). Given all this, if the second clause of § 12132 expanded liability to *all* of a public entity's operations, as Ms. Elwell argues, it would do so only for a *limited* class of disabled employees — for those who happen to be eligible to participate in an agency's outputs. If the defendant public entity is a soup kitchen providing meals

to the indigent, only disabled employees who are themselves indigent could bring a discrimination claim; other disabled and discriminated against employees would be left without recourse. If, as in our case, the defendant provides a university education, only disabled employees who qualify for admission would be entitled to bring an employment discrimination claim; other employees without the right test scores would not. Whether strictly speaking this result qualifies as an absurd one, it is surely a most unlikely reading of the statute.

Neither is it unavoidable. If we read *both* clauses of § 12132 as referring to the agency's services, programs, and activities, then the definition of "qualified individual" in § 12131(2) makes sense. The provision forbidding discrimination (§ 12132) and the one defining those qualified to sue (§ 12131(2)) work in concert rather than at odds. On this reading, the first clause precludes an agency from discriminatorily "exclud[ing]" or "den[ying] benefits" to disabled persons who are eligible for the services, programs, or activities the agency provides to the public. The second does distinctly additional work by prohibiting the agency from engaging in other forms of discrimination against those same individuals. While the first clause prevents an agency from baldly "exclud[ing]" or "den[ying] benefits" to handicapped individuals, the second clause prevents an agency from, say, making it disproportionately more difficult for handicapped individuals to participate; unfairly disadvantaging them compared to others; or otherwise discriminating against them in the manner the agency provides its services,

programs, and activities.  On this reading, the former clause may ban balder and more obvious acts of discrimination, but the latter is needed to address subtler if equally inequitable acts of discrimination.

Admittedly, if this were all we could find in the ADA bearing on the question of employment claims under Title II, the case might remain a close one.  But any lingering uncertainty about the best reading of § 12132 quickly falls away when we step back and view it in the context of the larger statutory structure.  So far we've confined our inquiry to the most pertinent and narrowest code provisions.  But when seeking to discern a statute's plain meaning, our view cannot be blinkered to the plow line directly ahead; we have to eye the whole statutory field.  *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.").  And doing that, looking to the larger composition of the ADA, quickly reminds us that it proceeds in three distinct movements, forbidding "discrimination against persons with disabilities in three major areas of public life:  employment, which is covered by Title I . . . ; public services, programs, and activities, which are the subject of Title II; and public accommodations, which are covered by Title III." *Tennessee v. Lane*, 541 U.S. 509, 516-17 (2004).  All this reminds us, too, that each title does important and

independent work — work that would be diminished, duplicated, even rendered superfluous were we to read Title II as covering employment discrimination.

Congress labeled Title I "Employment." Pub. L. No. 101-336, 104 Stat. 327, 330 (1990). That Title speaks of employment discrimination expressly and throughout, plainly seeking to eradicate that wrong. *See* 42 U.S.C. § 12111 *et seq*. In defining those "qualified" to sue under Title I, Congress indicated that disabled persons capable of "perform[ing] the essential functions" of the job in question could sue. *Id.* § 12111(8). Nothing turns on whether the plaintiff also happens to be eligible to receive his employer's services or participate in its programs or activities. Title I also specifies what defenses and exemptions are available to employers in employment discrimination cases, including exemptions for smaller employers. *Id.* § 1211(5)(A). It details what damages are and are not available. *Id.* § 1981a(a)(2). It incorporates the remedial procedures applicable to Title VII of the Civil Rights Act of 1964, including the requirement that employees exhaust their administrative remedies before the EEOC or a similar state agency before proceeding to court. *Id.* § 12117(a). And it likewise delegates regulatory authority for developing additional rules to carry out Title I's purposes to the EEOC, a body with expertise in employment law issues. *Id.* § 12116.

Title II, in contrast, is entitled "Public Services." 104 Stat. at 337. It focuses on discrimination in public services, programs, and activities but contains

precisely no explicit references to employment discrimination. It lays out no scheme of defenses for employers. It lacks the requirement that an otherwise qualified individual exhaust EEOC administrative remedies before bringing suit. *See* 42 U.S.C. § 12133; 29 U.S.C. § 794a. And regulatory authority is delegated not to the EEOC but to the Attorney General. 42 U.S.C. § 12134(a).

All this strongly suggests that Title I, not Title II, is the proper tool for pursuing employment discrimination claims. After all, "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983). By including a discussion of employment discrimination in Title I, Congress's failure to discuss it in Title II appears all the more a clear and deliberate choice of exclusion. Indeed, even if Title II *did* bear on employment discrimination by implication, as Ms. Elwell suggests, we would *still* give governing effect to Title I in light of its comparative specificity on the question of employment discrimination. "However inclusive may be the general language of a statute" like Title II, "it *will not be held to apply* to a matter specifically dealt with in another part of the same enactment." *Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 228 (1957) (emphasis added) (internal quotation marks omitted); *see also RadLAX Gateway Hotel, LLC v. Amalgamated*

*Bank*, 132 S. Ct. 2065, 2071 (2012).  Congress's most specific directions are its controlling directions.

Any other result would, as well, threaten to undo at least some of Title I. Part of the point of the canon of construction dictating that the specific controls the general is to "avoid[] . . . the superfluity of a specific provision that is swallowed by the general rule." *RadLAX*, 132 S. Ct. at 2071.  And that is a real risk here.  If Title II permitted employment discrimination claims against public entities as Ms. Elwell supposes, Title I's deliberate and calibrated rules of administrative exhaustion and its particular choice to delegate to the EEOC the responsibility for writing employment-related regulations (to take but a couple examples) would be undone with respect to that class of defendants.

No doubt this possibility has much to do with why parties sometimes try to use Title II instead of Title I to pursue employment discrimination claims.  In the past, state employees who failed to meet Title I's exhaustion requirements tried to win relief under Title II.  *See, e.g.*, *Zimmerman*, 170 F.3d at 1171.  More recently, the Supreme Court has held that states enjoy Eleventh Amendment immunity from suit under Title I, presenting an even bigger obstacle for public employees seeking to bring employment discrimination claims.  *See Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 364 (2001).  In response, litigants have again turned to Title II hoping to find an avenue for relief that Title I no longer supplies.  *See, e.g.*, *Henny v. New York State*, 842 F. Supp. 2d 530, 544-45

- 13 -

(S.D.N.Y. 2012). And undoubtedly this is why Ms. Elwell, herself a public employee barred by *Garrett* from proceeding under Title I, seeks to sue under Title II.

Of course, if Title II *did* supply a cause of action for employment discrimination as Ms. Elwell supposes, we would still have to ask, *could* it? Under our received Eleventh Amendment jurisprudence, states enjoy immunity from suit even when it's their own citizens who are doing the suing. To be sure, Congress can abrogate this immunity using its powers under Section 5 of the Fourteenth Amendment. But to do so Congress must first demonstrate that the States have engaged in a pattern of irrational discrimination. *Garrett*, 531 U.S. at 364. And from *Garrett*, we know Congress failed to identify a pattern of irrational discrimination in state employment practices when enacting Title I. *Id.* But how about in Title II? Might *that* provision successfully abrogate immunity with respect to state employment practices, even though Title I does not? For its part, *Garrett* noted but reserved the question. *See* 531 U.S. at 360 n.1. Since then, the Supreme Court has addressed Title II's interaction with state sovereign immunity but only in the context of the disabled's access to courthouses, holding that on *that* particular issue Title II *does* abrogate state immunity. *Lane*, 541 U.S. at 533-34. With only this much for guidance, many lower courts faced with the question whether Title II also abrogates state immunity with respect to employment discrimination claims have held it does not, reasoning that *Garrett*,

- 14 -

not *Lane*, more closely controls.  *See, e.g.*, *Clifton v. Ga. Merit Sys.*, 478 F. Supp. 2d 1356, 1368 (N.D. Ga. 2007); *Leverette v. Ala. Revenue Dep't*, 453 F. Supp. 2d 1340, 1344-45 (M.D. Ala. 2006); *Koslow v. Commonwealth of Pennsylvania*, 158 F. Supp. 2d 539, 542 (E.D. Pa. 2001), *rev'd on other grounds*, 302 F.3d 161 (3d Cir. 2002).  So even if Ms. Elwell *did* have a cause of action for employment discrimination under Title II, there's a real possibility it would still do her no good because the University might remain immune from suit.

For our part, we don't decide the immunity question today.  We don't because the parties haven't developed the point in much detail in their appellate briefs and, though the issue was presented and preserved in the district court, that court chose not to reach it.  We mention the issue, however, because it surely looms over all we do in this case:  even if Ms. Elwell were to win on the statutory question, it's a victory that might prove pyrrhic on remand when the immunity question could be avoided no longer.  And this means we must tread with particular trepidation.  It is our charge, after all, to prefer statutory constructions that avoid, not invite, serious constitutional problems like this one.  *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.").

- 15 -

Undaunted, Ms. Elwell replies with a structural argument of her own. She points to *other* anti-discrimination statutes and says the structure and meaning of those laws should inform our understanding of Title II. In particular, she points to Title IX of the Education Amendments of 1972 and the Rehabilitation Act of 1973. But there are simply too many differences between these other statutes and Title II of the ADA to warrant Ms. Elwell's interpretive course.

Beginning at the beginning, when it comes to explaining the intended scope of its coverage, the Rehabilitation Act expressly tells us it was enacted to "promote and expand *employment opportunities in the public and private sectors* for handicapped individuals." Pub. L. No. 93-112, § 2(8), 87 Stat. 355, 357 (1973) (codified as amended at 29 U.S.C. § 701) (emphasis added). Title IX does not limit its coverage at all, outlawing discrimination against any "person," Pub. L. No. 92-318, § 901(a), 86 Stat. 235, 373 (1972) (codified as amended at 20 U.S.C. § 1681(a)), broad language the Court has interpreted broadly. *See Bell*, 456 U.S. at 521 ("[I]f we are to give [Title IX] the scope that its origins dictate, we must accord it a sweep as broad as its language."). Meanwhile, Title II limits coverage to "qualified individuals with a disability" and proceeds to define that phrase without any reference to employment and in a way that (as we've seen) makes it awkward (at best) to cover employment. Underscoring further the difference in the scope of coverage between these laws, Congress has long since amended the Rehabilitation Act and Title IX to confirm that they cover "*all* of the

- 16 -

operations of . . . [an] instrumentality of a State or local government." 20 U.S.C. § 1687 (emphasis added); 29 U.S.C. § 794(b) (emphasis added). Yet, as we have seen, Congress has never gone so far with Title II or done anything else to suggest it reaches employment discrimination, despite many judicial interpretations reading it as leaving that job to Title I.

Other telling structural differences exist, too. Unlike the ADA, the Rehabilitation Act and Title IX contain no separate section, like Title I, to handle employment discrimination actions. Without a separate section to do that work, one has to believe either that they don't address employment discrimination at all or that they do the work with the language they have. In fact, the Supreme Court expressly relied on the *absence* of a separate provision as evidence the Rehabilitation Act as originally enacted did cover employment discrimination. *Darrone*, 465 U.S. at 632 n.13. In *Darrone*, the Court contrasted the Rehabilitation Act with the Civil Rights Act of 1964 where "it was unnecessary to extend Title VI more generally to ban employment discrimination, as Title VII comprehensively regulates such discrimination." *Id.* Exactly the same contrast might be made with the ADA: though the ADA as a whole was enacted to provide "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1), there is no need to extend Title II to achieve this goal when Title I already does that work.

Ms. Elwell responds by emphasizing that Title II of the ADA cross-references the Rehabilitation Act. Title II says that a plaintiff may avail himself of the "remedies, procedures, and rights set forth in § 794a" of the Rehabilitation Act. 42 U.S.C. § 12133. And this, she submits, means Title II effectively incorporates the Rehabilitation Act's scope of coverage, including its coverage of employment discrimination claims.

But the statutory language she identifies hardly does so much heavy lifting. The language in Title II she cites incorporates only one provision of the Rehabilitation Act, one specifying procedural rights and remedies. The language does *not* purport to incorporate the Rehabilitation Act's substantive guarantees, let alone its declaration in § 794(b) that its scope of coverage includes all of a governmental entity's operations. So, far from proving Ms. Elwell's point, the fact Congress chose to incorporate § 794a's processes but *not* § 794(b)'s scope of coverage or the Rehabilitation Act's other substantive provisions comes closer to "demonstrat[ing] precisely the opposite." *Zimmerman*, 170 F.3d at 1179. After all, "[c]ommon sense, reflected in the canon *expressio unius est exclusio alterius*, suggests that the specification of [one provision] implies" the exclusion of others. *Arizona v. United States*, 132 S. Ct. 2492, 2520 (2012) (Scalia, J., concurring in part and dissenting in part).

Speaking of cross-references, there is another that does Ms. Elwell's cause even more harm. After enacting the ADA, Congress revisited the question what

- 18 -

standards should be applied in assessing a complaint for employment discrimination under the Rehabilitation Act. In doing so, Congress chose to adopt and incorporate the standards found in Title I of the ADA. *See* Rehabilitation Act Amendments of 1992, Pub. L. No. 102-569, § 506, 106 Stat. 4344, 4428 (codified as amended at 29 U.S.C. § 794(d)). No mention was made of Title II. Given this, "[i]t would seem rather bizarre" to think Title II covers employment discrimination simply because the Rehabilitation Act does when "the Rehabilitation Act itself ties its employment cause of action to Title I." *Bledsoe v. Palm Beach Soil & Water Conservation Dist.*, 942 F. Supp. 1439, 1446 (S.D. Fla. 1996), *rev'd*, 133 F.3d 816 (11th Cir. 1998).

Still persisting with her argument that Title II and the Rehabilitation Act should be interpreted identically, Ms. Elwell points to the fact that Title II directs the Attorney General to promulgate regulations "consistent with . . . the coordination regulations . . . applicable to recipients of Federal financial assistance under section 794 of Title 29" of the Rehabilitation Act. 42 U.S.C. § 12134(b). And, she notes, at the time Congress passed the ADA the referenced Rehabilitation Act regulations included prohibitions on employment discrimination. *See* 28 C.F.R. § 41.52–.55 (1989). From this, she again asks us to infer that Title II must include an employment discrimination claim.

But, by exclusion and once again, § 12134(b) does not so much help Ms. Elwell's cause as hurt it. Section 12134(b) does not incorporate the

Rehabilitation Act's regulations into the ADA or direct the Attorney General to promulgate identical regulations for Title II. It simply says the Attorney General's regulations must be "consistent" — that is, compatible or not contradictory — with those under the Rehabilitation Act. *See Webster's*, *supra*, at 484; 3 *Oxford English Dictionary*, *supra*, at 773 ("agreeing or according in substance or form; congruous, compatible"). And meeting that objective is surely possible without reading employment into Title II. After all, the referenced Rehabilitation Act regulations cover not just discrimination in employment but an array of other issues — including discrimination in services, programs, and activities, along with accessibility standards for public facilities. Obviously, Congress sought in § 12134(b) to prevent the Attorney General and EEOC from whipsawing employers with contradictory rules in areas where their regulatory authority overlaps — not to adopt surreptitiously a whole new cause of action that would render some of its own legislative work in Title I a nullity.

Leaving aside the business of trying to analogize the Rehabilitation Act and Title IX — and in a different vein altogether — Ms. Elwell asks us to defer to regulations the Attorney General issued purporting to permit employment discrimination claims under Title II. *See* 28 C.F.R. § 35.140(a). But whatever *Chevron* deference we owe to an agency's interpretations and regulations when a statute is ambiguous, we are never permitted to disregard clear statutory directions in favor of administrative rules. If, after employing the "traditional

tools of statutory construction," *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984), we can say the statute is clear, "that is the end of the matter" and the statute governs as written. *Id.* at 842. In this case, those traditional tools of statutory construction — including a close examination of the text together with a careful review of the larger statutory structure, *see Robinson*, 519 U.S. at 341 — persuade us that Congress has spoken and spoken clearly to the question of employment discrimination claims and placed them exclusively in Title I. And in these circumstances our duty is clear: we must apply the law Congress has enacted, not different rules an agency has promulgated. *See Sullivan,* 496 U.S. at 493 (1990) ("If a court, employing traditional rules of statutory construction ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.").[2]

As we've already alluded to, our conclusion about the scope of Title II comports with the thoughtful judgment of the Ninth Circuit, even if our reasoning

---

[2] Neither is it clear the Attorney General's regulations would help Ms. Elwell even if they did apply. There's no question the University employs more than 15 people and is generally subject to jurisdiction under Title I. As such, the Attorney General's regulations indicate that to pursue a Title II employment discrimination claim she must meet the "requirements" of Title I, taking us right back to the place she seeks to avoid. 28 C.F.R. § 35.140(b)(1). While we do not now have to decide what those "requirements" include, if they included the requirement to exhaust administrative remedies in a timely fashion, that would spell trouble for Ms. Elwell: she has not suggested to us that she ever sought to exhaust her administrative remedies.

may differ in some small particulars. The Third and Sixth Circuits, too, have expressed the view that Title I is the exclusive province of employment discrimination within the ADA, if for still different reasons and in different contexts. *See Menkowitz v. Pottstown Memorial Med. Ctr.*, 154 F.3d 113, 118-19 (3d Cir. 1998); *Parker v. Metro. Life Ins. Co.*, 121 F.3d 1006, 1014 (6th Cir. 1997). Many district courts as well agree. *See, e.g.*, *Trickey v. Selig*, No. 12-CV-285, 2012 WL 3245956, at \*1 (E.D. Ark. Aug. 8, 2012); *Osborne v. Okla. Emp't Sec. Comm'n*, No. CIV-05-1500, 2006 WL 2090089, at \*3 (W.D. Okla. July 25, 2006); *Koslow*, 158 F. Supp. 2d at 541; *Motzkin v. Trs. of Bos. Univ.*, 938 F. Supp. 983, 996 (D. Mass. 1996).

We acknowledge the Eleventh Circuit and various district courts have gone the other way. *See, e.g.*, *Bledsoe*, 133 F.3d at 825; *Downs v. Mass. Bay Transp. Auth.*, 13 F. Supp. 2d 130, 135 (D. Mass. 1998); *Davoll v. Webb*, 943 F. Supp. 1289, 1297 (D. Colo. 1996); *Hernandez v. City of Hartford*, 959 F. Supp. 125, 133 (D. Conn. 1997). But we agree with the Ninth Circuit that few of these courts have adequately confronted the plain language and structure of the ADA before resorting to administrative regulations or legislative history. *Zimmerman*, 170 F.3d at 1183-84 & nn.11-15. Given the near unanimity that a claim doesn't arise from the first clause of § 12132, presumably these courts would, if confronted with the textual question, rely on the second clause for support. But none of these courts have paused to acknowledge the very strange fact that an

interpretation along these lines means only persons qualified to receive or participate in the defendant agency's services, programs, or activities can sue — leaving in the cold many disabled plaintiffs with otherwise strong employment discrimination claims. As well, most of the decisions going the other way predate *Zimmerman* and so lacked the helpful light it shone on the statutory text and structure. Neither are we surprised that the question whether Title II includes an employment discrimination claim hasn't arisen much since *Zimmerman* was decided. While the statutory question attracted much attention shortly after the ADA was enacted in 1990, with the Supreme Court's *Garrett* decision in 2001 the lower courts haven't had much call to decide it. They haven't because, again, whether the statute does or doesn't contain such a cause of action is of no moment for state employees like Ms. Elwell's if Congress failed to abrogate sovereign immunity. And since *Garrett* was handed down, many courts have found it simpler to proceed directly to that question, bypassing the statutory interpretation question altogether. *See, e.g.*, *Clifton*, 478 F. Supp. 2d at 1368.

Having reached the end of the road on Title II, that leaves us still to contend with Ms. Elwell's state law claim, and this we can do much more briefly. Ms. Elwell brought a claim under the Oklahoma Anti-Discrimination Act. At the time she brought suit, the OADA provided a cause of action against "any person" who commits employment discrimination "on the basis of handicap." *See* Okla. Stat. tit. 25, § 1901 (repealed). The OADA defined a "person" to include "the

state, or any governmental entity or agency." Okla. Stat. tit. 25, § 1201. Given this definition, Ms. Elwell argues, the State clearly anticipated OADA suits against it and, in this way, waived its Eleventh Amendment immunity.[3]

The difficulty is, the OADA doesn't exist in a vacuum. There is also the Oklahoma Governmental Tort Claims Act (OGTCA) to contend with. And § 152.1 of that law says "[t]he State of Oklahoma does hereby adopt the doctrine of sovereign immunity" and "[t]he state, *only to the extent and in the manner provided in this act*, waives its immunity and that of its political subdivisions. In so waiving immunity, it is not the intent of the state to waive any rights under the Eleventh Amendment to the United States Constitution." Okla. Stat. tit. 51, § 152.1 (emphasis added). It is undisputed that the OGTCA does not contain a waiver of immunity for OADA claims.

How then to resolve the conflict between OADA's apparent expectation of suits against the state and OGTCA's apparent prohibition of them? It comes down to a question of the law's base line. In the realm of sovereign immunity, the Supreme Court has decided that "a State will be deemed to have waived its

---

[3] Oklahoma has since revamped the OADA considerably. *See* Act of May 18, 2011, ch. 270, 2011 Okla. Sess. Law Serv. Ch. 270 (West). But by its own terms, the new law became effective only on November 1, 2011, *id.* § 22, well after Ms. Elwell filed her complaint and the underlying events took place. And there is no reason here as a matter of Oklahoma law to apply the new OADA retroactively. *See Barnhill v. Multiple Injury Trust Fund*, 37 P.3d 890, 898 (Okla. 2001) ("The general rule is that statutes have prospective operation unless the purpose and intent of the Legislature to give them a retroactive effect is expressly declared or necessarily implied from the language used.").

immunity only where stated by the most express language or by such overwhelming implication from the text as [will] leave no room for any other reasonable construction." *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 239-40 (1985) (internal quotation marks omitted). So the base line we are obliged to enforce is immunity and those seeking to show waiver bear the burden of showing room for no other reasonable construction of state law. And that's a burden Ms. Elwell simply cannot meet. It is at least as (if not more) reasonable to think the OADA gives way to the OGTCA as the other way round. After all, only the OGTCA speaks expressly to the question of immunity and the Supreme Court requires an express waiver of immunity before permitting suit.

Ms. Elwell seeks to argue otherwise by pointing to three cases: *Pellegrino v. State ex rel. Cameron University ex rel. Board of Regents of State*, 63 P.3d 535 (Okla. 2003), *Duncan v. City of Nichols Hills*, 913 P.2d 1303 (Okla. 1996), and *Locke v. Grady County*, No. CIV-09-327, 2009 WL 1564221 (W.D. Okla. June 4, 2009). All three hold that the notice and other procedural requirements the OGTCA imposes on "tort" claims against the state do *not* apply to OADA claims. In doing so, they reason that OADA claims simply are not "tort" claims within the meaning of the OGTCA.

But none of this answers (or even addresses) the question we must ask. For our purposes, how Oklahoma chooses as a matter of state law to define "tort" actions is neither here nor there. The question before us — whether a state has

effected a waiver of sovereign immunity — is one of federal law.  The cases Ms. Elwell cites simply do not speak to that federal question.

And even what they do say as a matter of state law doesn't do much to help, either.  By way of example, *Duncan* applies the rule common to both federal and state statutory interpretation that the specific controls the general:  "Where there are two provision[s] of the statutes, one of which is special and particular and clearly includes the matter in controversy . . . , it will be held that the special statute applies."  913 P.2d at 1310.  And here, of course and again, the most specific discussion of sovereign immunity in Oklahoma law is the OGTCA's explicit reservation, not the OADA's generic definition of the word "person" that nowhere mentions the doctrine.  So if anything *Duncan* proves consistent, not at odds, with our conclusion that the OGTCA cannot be ignored and serves to preclude a waiver of sovereign immunity.

Because Title II does not contain an independent cause of action for employment discrimination and because Ms. Elwell cannot carry her burden of showing a waiver of sovereign immunity that might permit her to proceed with an OADA claim, the judgment of the district court is affirmed.